UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LIVONIA PUBLIC SCHOOLS and
METROPOLITAN ASSOCIATION
FOR IMPROVED SCHOOL
LEGISLATION,

Case No. 16-10324

Paul D. Borman
United States District Judge

        Plaintiffs/Counter-Defendants,

v.

Stephanie Dawkins Davis
United States Magistrate Judge

SELECTIVE INSURANCE
COMPANY OF THE SOUTHEAST,

        Defendant/Counter-Plaintiff.

_____/

## OPINION AND ORDER:
## (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 59); AND
## (2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 57)

In this civil action, Plaintiffs Metropolitan Association for Improved School Legislation ("**MAISL**") and Livonia Public Schools ("**LPS**") sue their insurer, Defendant Selective Insurance Company of the Southeast, regarding a set of insurance policies under which both MAISL and LPS (collectively "**Plaintiffs**") were named as insured parties. The dispute is over the extent of Selective's obligation to reimburse Plaintiffs for past and ongoing costs that Plaintiffs have incurred in defending three lawsuits alleging misconduct by LPS employees.

Both parties have moved for summary judgment. In the manner fully set forth

below, each party's motion shall be granted in part and denied in part.

## I. BACKGROUND

### A. The Parties

Plaintiff MAISL is a group self-insured pool of Michigan public school districts formed under the Michigan Intergovernmental Contracts Between Municipal Corporations Act, Mich. Comp. Laws §124.1 *et seq*. Plaintiff LPS is a public school district incorporated as a municipal corporation under Michigan law. (ECF No. 8, Am. Compl. ¶¶ 1-2.) Defendant Selective Insurance Company of the Southeast ("**Selective**") is a commercial insurance company incorporated and headquartered in Indiana. (ECF No. 10, Answer ¶ 5.)

### B. Insurance Policies and Significant Provisions

Each policy at issue in this case ran one year from July 1 to July 1. The relevant time period includes three consecutive policy years: 2010, 2011, and 2012. Two policies from each of those years are implicated in this lawsuit, and the significant provisions of those policies are summarized below.

### 1. 2010-2011 Policies

From July 1, 2010 to July 1, 2011, Plaintiffs were insured under two Selective policies that are relevant here: Policy No. S1323571 ("**2010-2011 Primary Policy**") (ECF No. 10, Answer Ex. A), and Policy No. S1317854 ("**2010-2011 Umbrella Policy**") (ECF No. 10, Answer Ex. D).

Plaintiffs had policies that were materially identical to these two policies in the subsequent 2011-2012 term (and in fact had the some policy numbers as their 2010-2011 term counterparts). Those policies are discussed in depth below. To avoid redundancy, it is sufficient to say that the following descriptions of the 2011-2012 policies also apply to their 2010-2011 counterparts.

## 2. 2011-2012 Policies

The relevant policies that were in effect from July 1, 2011 until July 1, 2012 are Policy No. S1323571 ("**2011-2012 Primary Policy**")[1] (ECF No. 1, Compl. Ex. 2, Pg ID 79-201), and Policy No. S1317854 ("**2011-2012 Umbrella Policy**") (Compl. Ex. 4, Pg ID 234-365).

### a) 2011-2012 Primary Policy

The 2011-2012 Primary Policy is the most central policy to this case, and what follows is a summary of the most significant provisions of that policy.

#### i. *General Coverage Provisions*

The 2011-2012 Primary Policy's "General Liability" coverage applies to lawsuits and other claims arising from "bodily injuries or personal injuries, suffered or alleged to have been suffered" as well as "property damage or loss of use."

---

[1] Throughout the pleadings and the briefing on the instant Motions, the parties refer to the 2011-2012 Primary Policy using various different terms: the "General Liability Policy," the "Commercial General Liability Policy," the "CGL," or simply the "2011-2012 Policy." The term "Primary Policy" appears to be the most common and least potentially confusing, so that term is used here.

(Compl. Ex. 2, 2011-2012 Primary Policy at Pg ID 109.) Subject to certain exclusions discussed *infra*, the policy provides that Selective "must defend any suit against the Insured that seeks damages for bodily injury, property damage or personal injury this insurance covers, even if the allegations are groundless, false or fraudulent. We may settle any claim or suit we consider expedient." (*Id.*) The injury giving rise to the lawsuit "must be caused by an occurrence during the term of [the 2011-2012 Primary Policy]." (*Id.*) The 2011-2012 Primary Policy relevantly defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (*Id.* at Pg ID 115.) The 2011-2012 Primary Policy defines "personal injury" as "injury other than 'bodily injury' arising out of . . . a. false arrest, false imprisonment, detention . . . ; b. mental anguish and humiliation; c. wrongful entry, wrongful eviction, malicious prosecution; [or] d. an oral or written publication that slanders, libels, harms property value or violates privacy rights." (*Id.* at Pg ID 115-16.)

Among the various forms and endorsements that affect the scope of the 2011-2012 Primary Policy's coverage is the "Supplemental Declarations" section. The limits for General Liability are set forth in Part III, Section K of the Supplemental Declarations. (*See id.* at Pg ID 83.) That section provides that there is a $1,000,000

4

indemnification limit for "[e]ach occurrence,"[2] and identifies the "General Aggregate Limit" as "N/A." (*Id.*) "General Aggregate Limit" is defined as "the most [Selective] will pay in any year of this insurance for damages and expenses defined by Ultimate Net Loss." (*Id.* at Pg ID 116.) In a separate section entitled "Common Policy Provisions," the policy states that "[t]he policy limit will not be reduced by defense cost or loss adjustment expenses." (*Id.* at Pg ID 123.)

Selective's obligations under the policy, subject to the $1,000,000 per-occurrence limit referenced above, are paid to the insured only after the insured first pays a "Self Insured Retention" ("**SIR**"). (*See id.* at Pg ID 81 ("The limit of liability under this agreement shall be in excess of the retained amount shown on the Schedule of Self Insured Retentions.").) The Schedule of Self-Insured Retentions provides for a $500,000 SIR "per occurrence or per loss from a covered cause of loss." (*Id.* at Pg ID 84.)

Two other terms used in the 2011-2012 Primary Policy are important here. First is "**Ultimate Net Loss**," which the policy defines as having two components:

A. all sums which the Insured is legally obligated to pay as damages including pre- and post-judgement [*sic*] interest, whether by reason

---

[2] The policy defines "occurrence" as "an accident; . . . a happening; . . . an event; or . . . continuous or repeated exposure to conditions, [which] unexpectedly or unintentionally lead[s] to bodily injury or property damage during the term of this insurance. All exposure to substantially the same general conditions of one location is one occurrence." (*Id.* at Pg ID 116.)

of adjudication or settlement because of liability to which this insurance applies, and

B. all expenses incurred by the Insured (including any third party administrator) in the investigation, negotiation, settlement or defense of claims or suits seeking such damages, excluding only the salaries of the Insured's regular employees, provided, however, that **Ultimate Net Loss** shall not include any damages or expenses or liability excluded or not otherwise covered by this policy.

(2011-2012 Primary Policy at Pg ID 85 (emphasis in original).)

The second key term is "**Loss Fund Policy Aggregate**," defined as

[t]he amount of loss dollars retained by the Insured, which is the maximum amount to be applied for all **Self Insured Retentions**. No losses in excess of the **Self Insured Retentions** are chargeable to the loss fund. In addition, the **Self Insured Retention** is limited to the aggregate as indicated for all occurrences, persons, organizations, accidents, employees or claims. This aggregate **Self Insured Retention** applies separately to each consecutive annual period and any remaining period of less than 12 months starting with the beginning of the policy period shown in the Declaration.

(*Id.* (emphasis in original).) The Loss Fund Policy Aggregate in the 2011-2012 Primary Policy is $3,600,000. (*Id.* at Pg ID 84.)

Bringing all of these terms together, the 2011-2012 Primary Policy states:

In consideration of the reduced premium charged, [Selective]'s obligation to pay for damages caused by a resulting [*sic*] from any occurrence or covered cause of loss is limited to the payment of that portion of the **Ultimate Net Loss** which, subject to the **Loss Fund Aggregate**, is in excess of the **Self Insured Retention** amount [specified in the policy].

. . .

[Selective]'s duty to investigate, settle and defend claims or suits under this policy applies only after the **Ultimate Net Loss** exceeds the **Self Insured Retention,** and the **Maintenance Deductible,** if applicable.[3] [Selective] shall have the right, but not the duty, to associate with you in defense of any claim or suit for which the **Ultimate Net Loss** is likely to exceed the **Self Insured Retention**. [Selective] shall not be obligated to defend any claim or suit after the applicable limit of [Selective]'s liability has been exhausted through payment of claims, settlements or judgements [*sic*].

(*Id.* (emphasis in original).)

To summarize the provisions quoted above: absent modification by any other terms of the policy, the 2011-2012 Primary Policy obligates Selective to pay for damages and defense costs incurred based on claims arising from actual or alleged bodily or personal injuries. For each occurrence, the insured must first pay up to $500,000 as an SIR, after which Selective is obligated to reimburse the insured up to $1,000,000 per occurrence. Defense costs reimbursed by Selective do not count towards the $1,000,000 limit, though defense costs paid by the insured do count towards exhausting the SIRs. Although there is a $1,000,000 per-occurrence limit, there is no aggregate limit in the event of multiple occurrences. If the insured's SIR payments reach $3,600,000, however, any costs in excess of that are covered.[4]

---

[3] The Maintenance Deductible expressly does not apply to General Liability coverage, so it is not applicable in this case. (See *id.* at Pg ID 85.)

[4] Also in the 2011-2012 Primary Policy is a "Third Party Administrator Identification Form," which states that claims under the 2011-2012 Primary Policy

## ii. *Exclusion 7*

The section of the 2011-2012 Umbrella Policy entitled "Exclusions" sets forth categories of claims that are entirely excluded from coverage under the policy. One of these is Exclusion 7: "**Personal Injury** arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." (2011-2012 Primary Policy at Pg ID 118 (emphasis in original).)

## iii. *Exclusion 16*

Exclusion 16 in the same section of the policy is entitled "**Errors or Omission**." (2011-2012 Primary Policy at Pg ID 119 (emphasis in original).) This exclusion, which (importantly for present purposes) does not apply to damages for claims based on bodily injury or personal injury, is defined as follows:

> Damages, *other than damages for "bodily injury", "property damage", "personal injury" or "advertising injury"*, arising from any actual or alleged error or misstatement or act or omission or neglect or violation of any federal or state civil rights, or breach of duty including misfeasance, malfeasance, or nonfeasance by the insured in the discharge of their duties for the Public Entity, or by members of the School Board or governing committee, individually or collectively, or for any loss.

(*Id.* (emphasis added).)

---

would be administered by third-party administrator Gallagher Bassett Services, Inc. ("**Gallagher Basset**"). (2011-2012 Primary Policy at Pg ID 86.)

### iv. Endorsement 11

Policy Change Endorsement 11 to the 2011-2012 Primary Policy

("**Endorsement 11**") contains two elements. First, it provides that under "PART III,

Section K: General Liability, the General Aggregate Limit of Liability applicable to

Abuse or Molestation coverage only is amended to $1,000,000 in lieu of

$3,000,000." (2011-2012 Primary Policy at Pg ID 151.) Second, it defines "abuse or

molestation coverage" as follows:

> 1. the actual or threatened abuse of molestation by anyone of any person
>    while in the care, custody or control of any insured, or
> 2. the negligent
>    a. employment;
>    b. investigation;
>    c. supervision;
>    d. reporting to the proper authorities, or failure to so report; or
>    e. retention;
>    of a person for whom any Insured is or ever was legally responsible
>    and whose conduct would be excluded by paragraph 1, above.

(*Id.*)

### v. Endorsement 19

Policy Change Endorsement 19 to the 2011-2012 Primary Policy

("**Endorsement 19**") provides that the policy does not cover claims arising from

"expected or intended" injuries, with exceptions (that are also important to this case)

for claims arising from reasonable force used to protect persons or property, and for

9

claims arising from corporal punishment. Specifically, Endorsement 19 adds to the

list of Exclusions a new "Exclusion 17," which provides:

> Expected or Intended Injury. "Bodily Injury" or "Property Damage"
> expected or intended from the standpoint of the Insured. This exclusion
> does not apply to "Bodily Injury" resulting from:
>> a. The use of reasonable force to protect persons or property; or
>> b. Corporal punishment to any student or pupil administered by or
>> at the direction of the insured.

(2011-2012 Primary Policy at Pg ID 160.)

### b) 2011-2012 Umbrella Policy

#### i. *General coverage provisions*

The 2011-2012 Umbrella Policy was in effect for the same term as the 2011-

2012 Primary Policy: July 1, 2011 to July 1, 2012. (Compl. Ex. 4, 2011-2012

Umbrella Policy at Pg ID 234-365.) The "Coverages" section of the 2011-2012

Umbrella Policy states as follows:

> We will pay on behalf of the insured the "ultimate net loss" in excess
> of the "retained limit" that the insured becomes legally obligated to pay
> as damages because of "bodily injury", "property damage" or "personal
> and advertising injury" to which this insurance applies. We will have
> the right and duty to defend the insured against any "suit" seeking those
> damages when the "underlying insurance" does not provide coverage
> or the limits of "underlying insurance" have been exhausted.

(2011-2012 Umbrella Policy at Pg ID 236.) The "underlying insurance" policies

listed in the 2011-2012 Umbrella Policy include the 2011-2012 Primary Policy, as

10

well as automobile liability and employers liability policies that are not implicated in this lawsuit. (*See id.* at Pg ID 235.)

The term "retained limit"—which the coverage provision quoted directly above indicates is a payment threshold for the insured, analogous to an SIR in the 2011-2012 Primary Policy—is further defined in the 2011-2012 Umbrella Policy:

> "Retained limit" means the greater of
>
> > a. The total of the limits as shown in the Declarations for the coverage(s) in question, and the limits of any other insurance not shown in the declarations that is valid and collectible; or
> > b. The limit shown in the Declarations as the "self-retained limit".
>
> However, "retained limit" does not mean any "sub-limit."

(Id. at Pg ID 251.)

The limit shown in the Declarations of the 2011-2012 Umbrella Policy as the "self-retained limit"—i.e., the second of the two alternative definitions for "retained limit" quoted above—is "$0." (*Id.* at Pg ID 235.)

"This generous insuring agreement is tempered by a litany of exclusions." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, No. 17-2421, ___ F.3d ___, 2018 WL 3978211, at *1 (6th Cir. Aug. 21, 2018). The following is a summary of the exclusions in the 2011-2012 Umbrella Policy that are directly relevant to the instant Motions.

### ii. *Sub-limit exclusion*

The section of the 2011-2012 Umbrella Policy entitled "Limits of Insurance"

provides that "[i]f the applicable limit of insurance of an 'underlying policy' is a 'sub-limit', this insurance will not apply, whether or not such 'sub-limit' has been reduced by any payments under the 'underlying policy'." (*Id.* at Pg ID 245.) "Sub-limit" is defined in the 2011-2012 Umbrella Policy as "a limit of insurance of the 'underlying policy' which . . . [a]s originally granted at the effective date of the 'underlying policy', or . . . [a]t its original addition by endorsement to that 'underlying policy'[,] is an amount less than that stated in the Declarations of this policy." (*Id.* at Pg ID 251.)

### iii. *Abuse or molestation exclusion*

The 2011-2012 Umbrella Policy contains an "Abuse or Molestation Exclusion." The provision defines "abuse or molestation" in the same way as the analogous provision in the 2011-2012 Primary Policy, but rather than limiting coverage for abuse/molestation claims like the 2011-2012 Primary Policy does, the 2011-2012 Umbrella Policy excludes such claims from coverage altogether:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
1. The actual or threatened abuse or molestation by anyone of any person while in care, custody or control of any insured; or
2. The negligent:
   a. Employment;
   b. Investigation;
   c. Supervision;
   d. Reporting to the proper authorities, or failure to so report; or

12

e. Retention
of a person for whom any insured is or ever was legally responsible
and whose conduct would be excluded by 1, above.

(*Id.* at Pg ID 253.)

### iv.    *Expected or intended injury exclusion*

The 2011-2012 Umbrella Policy excludes claims based on "'[b]odily injury'

or 'property damage' expected or intended from the standpoint of the insured. This

exclusion does not apply to 'bodily injury' resulting from the use of reasonable force

to protect persons or property." (*Id.* at Pg ID 238.) Unlike the analogous provision

in the 2011-2012 Primary Policy, the 2011-2012 Umbrella Policy's exclusion of

claims based on expected or intended injury does not have an exception for claims

arising from corporal punishment.

### 3.    2012-2013 Policies

The relevant policies that were in effect from July 1, 2012 until July 1, 2013

are Policy No. S1317853 ("**School Board Legal Liability Policy**" or "**SBLL**

**Policy**") (Compl. Ex. 3, Pg ID 203-232), and Policy No. S1317854 ("**2012-2013**

**Umbrella Policy**") (Compl. Ex. 5, Pg ID 367-400).[5]

_____

[5] As with the earlier policy years, the two 2012-2013 policies discussed herein were
not the only policies in effect during that policy year. In fact, the record shows that
during the 2012-2013 policy year, Plaintiffs had a primary policy much like those
that it had in the previous two years. Plaintiffs have not identified that policy as a
source of coverage in this action, presumably because the events from which the

## a) School Board Legal Liability Policy (2012-2013)

The SBLL Policy has several relevant components: (i) the general provisions governing liability coverage; (ii) various exclusions, conditions, and limitations (including an abuse/molestation limitation); and (iii) a provision for limited coverage of legal defense costs in civil or criminal proceedings based on "dishonest, fraudulent, criminal or malicious" acts or omissions. Each of these four components is summarized in turn below.

### i. *General Coverage Provisions*

The "Coverage" section of the SBLL Policy states as follows:

> We will pay those sums that the insured becomes legally obligated to pay as "damages" by reason of a "wrongful act" in the discharge of duties on behalf of the educational entity listed in the Declarations, but only as a result of a "claim" first made against the insured during this "policy period" that takes place in the "coverage territory". We will have the right and duty to defend, using counsel of our choice, any "suit" seeking "damages" in connection with such "claim". We may, at our discretion, investigate and/or settle any "claim" or "suit." Our right and duty to defend concludes when we have used up the applicable Limit or Insurance in the payment of any judgment(s) and/or settlement(s).

(SBLL Policy at Pg ID 206.)

The SBLL Policy defines "wrongful act" as "[a]ny actual or alleged . . . [e]rror or omission, misstatements, misleading statements, neglect or breach of duty; or . . .

lawsuits against LPS arose occurred before that policy took effect on July 1, 2012. (*See* Compl. Ex. 5 at Pg ID 368.)

[v]iolation of civil rights protected under any state or federal civil rights law . . . by you or which arises out of the discharge of duties for you, individually or collectively." (*Id.* at Pg ID 215.) The SBLL Policy limits both per-claim liability and aggregate liability to $1,000,000 per school district. (*Id.* at 204.)

The SBLL Policy has an overall deductible of $25,000. (*See id.* at Pg ID 232.)

### ii.  *Exclusions and Conditions*

The "Exclusions" section of the SBLL Policy relevantly provides that the SBLL Policy "does not apply to any 'damages', 'claims' or 'suits'" directly or indirectly arising from several different kinds of actions, including:

> a. Directly or indirectly arising out of any dishonest, fraudulent, criminal or malicious act or omission by any insured.
>
> . . .
>
> c. Directly or indirectly arising out of . . . assault, or battery . . . .
>
> . . .
>
> g. Directly or indirectly arising from "bodily injury", mental anguish, emotional distress, "property damage", or "advertising injury" . . . .

(SBLL Policy at Pg ID 207.)

Additionally, the "Conditions" section of SBLL Policy includes a condition called "Two or More Coverage Forms or Policies Issued By Us":

> If this Coverage Form and any other Coverage Form, or policy issued to you by us or any company affiliated with us apply to the same "claim," the aggregate maximum Limit of Insurance under all Coverage Forms [or] policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated

15

company specifically to apply as excess insurance over this Coverage Form.

(*Id.* at Pg ID 212.)

Lastly, the SBLL Policy has its own "Abuse or Molestation Exclusion," which provides as follows:

> The Company shall not make any payment in connection with any "claim" made against the "insured":
>
> > 1. Arising out of the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any "insured", or
> >
> > 2. Arising out of the negligent:
> >
> > > (a) employment;
> > >
> > > (b) investigation;
> > >
> > > (c) supervision;
> > >
> > > (d) reporting to the proper authorities; or failure to so report; and/or
> > >
> > > (e) retention
> >
> > of a person for whom any "insured" is or ever was legally responsible (including but not limited to all persons who were, now are or shall be employed by the "educational entity") and whose conduct would be excluded by 1, above.
>
> Notwithstanding the above, the most the Company shall pay to defend or investigate any actual or, threatened abuse or molestation claim shall be $100,000 annually per member district.

(*Id.* at Pg ID 225.)

### *iii. Limited Civil Legal Expense for Innocent Insureds Endorsement*

The last relevant component of the SBLL Policy for present purposes is the

"Limited Civil Legal Expense for Innocent Insureds Endorsement." (SBLL Policy at Pg ID 229.) That Endorsement modifies the SBLL Policy's exclusion, quoted above, of claims, damages, or suits "[d]irectly or indirectly arising out of any dishonest, fraudulent, criminal or malicious act or omission by any insured." (*Id.* at Pg ID 207.) The Limited Civil Legal Expense for Innocent Insureds Endorsement provides that this exclusion for dishonest, fraudulent, criminal or malicious acts or omissions

> shall not apply to those "civil legal expenses" payable or paid by an insured in connection with a "suit" alleging a dishonest, fraudulent, criminal or malicious act or omission by that insured in the discharge of that insured's duties for and on behalf of the public entity listed in the Declarations and to which this insurance would otherwise apply until either:
>> (1) In a civil proceeding, that insured, in any way, admits or is adjudicated to be culpably responsible for a dishonest, fraudulent, criminal or malicious act or omission, or
>> (2) In a criminal or quasi-criminal proceeding, that insured, has been convicted or entered a guilty plea or <u>nolo contendere</u> plea to a criminal or quasi-criminal charge, establishing intent or any of the acts of commission or omission that may establish culpability of that insured for any dishonest, fraudulent, criminal or malicious act or omission.

(*Id.*)

The Endorsement defines "civil legal expenses" as "attorney's fees and all related litigation costs and fees to defend 'suits.'" (*Id.* at Pg ID 231.) The Endorsement also provides for a $50,000 aggregate limit, and coverage under the

17

Endorsement depends on the insured's abiding by certain conditions, including cooperating with any investigation into the expenses by Selective, notifying other insurers whose coverage might be available, cooperating with Selective in terms of coordinating other applicable insurance, retaining and cooperating with Selective's choice of defense counsel, and acknowledging the applicable coverage limitations. (*Id.* at Pg ID 230-31.)

The SBLL Policy's $25,000 deductible does not apply for purposes of the Limited Civil Legal Expense for Innocent Insureds Endorsement. (*See id.* at Pg ID 231.)

### b) 2012-2013 Umbrella Policy

The 2012-2013 Umbrella Policy was in effect for the same term as the SBLL Policy: July 1, 2012 to July 1, 2013. (Compl. Ex. 5, 2012-2013 Umbrella Policy at Pg ID 366-400.) The 2012-2013 Umbrella Policy lists three policies as the "underlying insurance" policies that it supplements, and these include the 2012-2013 primary policy that is not at issue in this case, but do not include the SBLL Policy. (2012-2013 Umbrella Policy at Pg ID 368.)

Besides the coverage dates and the underlying insurance policies, the 2012-2013 Umbrella Policy is materially identical to the 2011-2012 Umbrella Policy: like its predecessor, the 2012-2013 Umbrella Policy has a retained limit of $0, does not supplement underlying policies that are subject to sub-limits, and does not cover

18

claims arising from actual or threatened abuse or molestation (or negligence by the insured regarding threatened abuse or molestation). (*Id.* at Pg ID 368, 378, 386.)

## C. Underlying Lawsuits

The instant lawsuit turns on the extent of Selective's duties under the various insurance policies to defend and to pay defense costs in connection with three underlying lawsuits.[6] All of those lawsuits allege misconduct by current or former LPS employees and board members related to students in preschool classes at Webster Elementary School ("**Webster**"), which is part of LPS. The relevant allegations and procedural histories of those lawsuits are summarized below.

### 1. The *Gohl* Lawsuit

Plaintiff Lauren Gohl first filed suit against LPS and four LPS employees in the Eastern District of Michigan on behalf of her minor son J.G. on November 26, 2012. *See Gohl v. Livonia Public Schools, et al.*, 12-cv-15199 (E.D. Mich. 2012) (Goldsmith, J.). The plaintiff amended her complaint in 2013 to add seven additional LPS employees as defendants (Compl. Ex. 7, *Gohl* First Amended Complaint), and amended it again in 2014 in ways that are not material to this case. (ECF No. 8 Ex. 8, *Gohl* Second Amended Complaint).

---

[6] As a technical matter, there are four underlying lawsuits: the plaintiff in one of the federal actions (*Gohl*) filed a state-court lawsuit after her federal claims were dismissed. But because the state-court action was based on the same allegations as the federal action, they are treated as one lawsuit for all practical purposes, and are referred to collectively in this Opinion and Order as the "**Gohl lawsuit**."

The central factual allegations in *Gohl* remained the same throughout the pleading amendments. The *Gohl* plaintiff alleged that on March 5, 2012, defendant Sharon Turbiak, a special-needs teacher at Webster, "grabbed [J.G.] by the top of his head, jerked it backwards and yelled directly into his face, 'You need to listen to me.'" (*Gohl* Second Amended Complaint ¶ 17.) Owing to J.G.'s physical and mental disabilities, the plaintiff alleged, this action was damaging and potentially life-threatening to J.G. (*Id.* ¶¶ 18, 23.) The plaintiff further alleged that Turbiak had previously been the subject of numerous reports of physical and verbal abuse against students, and that the various LPS-affiliated defendants in the action failed to report the incident to Child Protective Services as required by Michigan law. (*Id.* ¶¶ 19-22.) The final iteration of the complaint named twelve defendants—LPS itself and eleven LPS employees in their individual and official capacities—and asserted nine state and federal claims. (*See generally id.*)

The LPS defendants were granted summary judgment in the *Gohl* federal lawsuit on September 30, 2015. *See generally Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d 1066 (E.D. Mich 2015). The five federal claims were dismissed with prejudice, and the four state-law claims were dismissed without prejudice. *See id.* at 1090. The Sixth Circuit affirmed this decision on September 8, 2016, and the Supreme Court denied the plaintiff's request for *certiorari* on October 2, 2017. *See Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 685 (6th Cir. 2016), *cert. denied*,

No. 16-1001, 2017 WL 635927 (U.S. Oct. 2, 2017).

Shortly after the LPS defendants were granted summary judgment by the district court in the federal lawsuit, the plaintiff filed an action in the Wayne County Circuit Court based on the same facts. The state-court complaint asserted claims of gross negligence, willful and wanton misconduct, and assault and battery against Turbiak, and a claim of failure to report child abuse under Mich. Comp. Laws § 722.623 against the other ten individual defendants from the federal case. (ECF No. 8 Ex. 11, *Gohl* State Court Complaint.) That action remains pending. *See generally Gohl v. Turbiak*, No. 335389, 2018 WL 2067796 (Mich. Ct. App. May 3, 2018).

### 2.    The *Doe* Lawsuit

The *Doe* lawsuit was filed on behalf of three physically and/or mentally disabled minor children on April 15, 2013 in the Eastern District of Michigan. *See Doe et al. v. Livonia Public Schools et al.*, 13-cv-11687 (E.D. Mich. 2013) (Levy, J.). The complaint in the *Doe* lawsuit alleges acts of physical and emotional abuse by Turbiak and by Nancy Respondek, a classroom aide at Webster, and also asserts claims against LPS and various LPS employees in connection with those alleged acts of abuse. (Compl. Ex. 9, *Doe* Complaint ¶¶ 50-67.) The *Doe* lawsuit names 17 individual defendants in addition to LPS, and asserts a total of 85 counts consisting of 51 federal claims and 34 state-law claims. (*See generally id.*)

The complaint alleges that Turbiak and Respondek committed acts of physical

or emotional abuse "[o]n multiple occasions in the 2010-2011 and/or 2011-2012 school year(s)." (*Id.* ¶¶ 50, 52, 54, 56, 58.) Beyond this, the complaint alleges four incidents that are linked to specific months or dates:

> 51. By way of example, in March 2012, Defendant TURBIAK moved a student's chair with her foot and the student landed on her bottom on the floor. Defendant TURBIAK laughed and stated "I have a sick sense of humor".
>
> . . .
>
> 53. By way of example, on March 5, 2012, Defendant TURBIAK grabbed a student by the top of his head and jerked it back quite aggressively.
>
> . . .
>
> 57. By way of example, on March 20, 2012, Defendant RESPONDEK walked into the play area, took a student by his arm, spanked him on the buttocks, and yelled "No" in his face.
>
> . . .
>
> 59. By way of example, on May 2, 2012, Defendant RESPONDEK raised her voice at deaf students, and yelled at them.

(*Id.* ¶¶ 51, 53, 57, 59.)

The *Doe* lawsuit remains pending. The court conducted a hearing on the defendant's motion for summary judgment on May 9, 2018, and that motion is currently under advisement.

### 3.    The *Telerico* Lawsuit

The *Telerico* lawsuit was filed by plaintiff Terri Roeder on behalf of her son C.T. in the Eastern District of Michigan on May 6, 2013. *See Roeder v. Livonia Public Schools, et al.*, 13-cv-12012 (E.D. Mich. 2013) (Parker, J.). The *Telerico*

lawsuit arises chiefly from an alleged March 20, 2012 incident in which defendant Respondek, at defendant Turbiak's direction, "physically grabbed [C.T.] by his arm, hit him on his buttocks area and yelled directly in his face" after he "flipped over a classroom play table." (Compl. Ex. 10, *Telerico* Complaint ¶ 19.) The complaint alleges that "[a] short time later another aide in the room intervened on [C.T.]'s behalf to prevent TURBIAK and RESPONDEK from inflicting further physical, emotional, and verbal abuse" on C.T., who suffers from physical and cognitive impairments including Down's Syndrome, an atrial septal defect in his heart, and asthma. (*Id.* ¶¶ 2, 19-20.) The complaint further alleges that the March 20, 2012 incident described above "as well as other actions before that date amounted to an assault and battery of [C.T.]" (*Id.* ¶ 29.)

The *Telerico* lawsuit names eight individual defendants in addition to LPS, and asserts a total of nine counts consisting of three federal claims and six state-law claims. On August 23, 2017, the court dismissed all pending motions after being advised that the parties had reached a settlement. (*Roeder v. Livonia Public Schools, et al.*, 13-cv-12012 (E.D. Mich. 2013), ECF No. 230.) The court approved the parties' settlement in a sealed order issued on May 15, 2018. (*Roeder v. Livonia Public Schools, et al.*, 13-cv-12012 (E.D. Mich. 2013), ECF No. 255.)

### D. Background Facts Regarding Coverage under the Policies

Having detailed the potentially applicable insurance policy provisions and

summarized the underlying lawsuits, this Opinion and Order will now set forth additional pertinent background facts—principally the communications between the parties from 2013 to 2015 regarding the scope of the policies' coverage. Central to Plaintiffs' claims is their assertion that Selective substantially changed its position regarding the scope of the policies' coverage of the underlying lawsuits, and that Plaintiffs detrimentally relied on what they characterize as "Selective's multiple, ephemeral and contradictory coverage positions" between 2013 and 2015. (ECF No. 57, Pls.' Mot. at Pg ID 2569.)

### 1.    Selective's Initial Coverage Positions

The initial positions that Selective took as regards the scope of Plaintiffs' coverage under several of the policies at issue are reflected in a series of letters from Selective to Plaintiffs between December 2012 and August 2013. These letters addressed coverage under the Primary Policies and the SBLL Policy, but made no mention of the Umbrella Policies. The following is a summary of these communications, organized by the specific policy the communications pertained to, rather than in a strictly chronological fashion.

### a) SBLL Policy

In three letters to LPS sent between December 2012 and August 2013, Selective's third-party administrator Summit Risk Services ("**Summit**") explained that coverage under the SBLL Policy would be denied for each of the *Gohl*, Doe,

24

and *Telerico* lawsuits. (Compl. Exs. 15-17.)

First, in a letter to LPS dated December 31, 2012, Summit explained that coverage under the SBLL Policy for the *Gohl* lawsuit would be denied. (Compl. Ex. 15.) The letter acknowledged receipt of the complaint in the *Gohl* lawsuit, quoted generally relevant provisions of the SBLL Policy, and explained specifically that the SBLL Policy contained separate exclusions for: (1) claims arising from bodily injury, mental anguish, or emotional distress; (2) claims arising from assault and battery; and (3) claims arising from fraudulent, dishonest, criminal, or malicious acts or willful violations of law. (*Id.* at Pg ID 625-30.) The letter then concluded that "[a]s the claims [in the *Gohl* lawsuit] arise from bodily injury and alleged assault and Battery, Selective will not be providing a defense or indemnification in this matter pursuant to the School Board Legal Liability policy." (*Id.* at Pg ID 630.)

Then, in a letter to LPS dated May 20, 2013, Summit explained that coverage under the SBLL Policy for the *Doe* lawsuit would be denied. (Compl. Ex. 16.) Similarly to the December 31, 2012 letter concerning the *Gohl* lawsuit quoted above, the May 20, 2013 letter acknowledged receipt of the complaint in the *Doe* lawsuit, quoted various provisions of the SBLL Policy, and noted that the SBLL Policy contained separate exclusions for: (1) claims arising from bodily injury, mental anguish, or emotional distress; (2) claims arising from assault and battery; and (3) claims arising from fraudulent, dishonest, criminal, or malicious acts or willful

violations of law. (*Id.* at Pg ID 632-37.) Based on those exclusions, the letter explained, "Selective will not be providing a defense or indemnification in this matter pursuant to the School Board Legal Liability policy." (*Id.* at Pg ID 637.)

Finally, in a letter to LPS dated August 9, 2013, Summit explained that coverage under the SBLL Policy for the *Telerico* lawsuit would be denied. (Compl. Ex. 17.) Like the other two letters, the August 9, 2013 letter acknowledged receipt of the relevant complaint, quoted various provisions of the SBLL Policy, and noted that the SBLL Policy contained separate exclusions for: (1) claims arising from bodily injury, mental anguish, or emotional distress; (2) claims arising from assault and battery; and (3) claims arising from fraudulent, dishonest, criminal, or malicious acts or willful violations of law. (*Id.* at Pg ID 639-44.) The letter then explained that "[a]s the claims arise from bodily injury, assault and battery, and emotional distress, Selective will not be providing a defense or indemnification" for the *Telerico* lawsuit pursuant to the SBLL Policy. (*Id.* at Pg ID 644.)

Each of the three letters described above contained the following paragraph at or near the end of the letter:

> The dispositive policy terms and conditions set forth above are not intended to be all-inclusive. If you have any facts or additional information in your possession which would change or alter the facts on which we have based our decision, please forward it to my attention immediately. Selective reserves its rights to further supplement or alter our coverage position.

26

(Compl. Ex. 15 at Pg ID 630; Ex. 16 at Pg ID 636; Ex. 17 at 644.)

### b) Primary Policies

On January 17, 2013, Selective sent a letter to MAISL reserving its rights under the 2011-2012 Primary Policy as regards the *Gohl* lawsuit. (Compl. Ex. 18.) In that letter, Selective stated that certain allegations in the complaint may not qualify as "occurrences," and quoted several provisions of the 2011-2012 Primary Policy: the exclusion for claims arising from willful violations of law; the exclusion for non-injury damages arising from errors or omissions; and Endorsement 19, which excludes claims arising from expected or intended bodily injury but exempts from that exclusion claims arising from "[c]orporal punishment to any student or pupil administered by or at the direction of the insured." (*Id.* at Pg ID 652.) Selective did not state a specific coverage position in the January 17, 2013 letter. (*Id.*) The letter was signed by Lene Behrens, the Selective claims specialist assigned to the policies under discussion here until July 2014. (*Id.* at Pg ID 653; Pls.' Mot. Ex. 122, Deposition of Lene Behrens at 25:24-26:6, 52:1-2, 59:5-7.)

On May 17, 2013, Behrens sent a similar reservation-of-rights letter ("**ROR**") to MAISL reserving its rights under the 2011-2012 Primary Policy as regards the *Doe* lawsuit. (Compl. Ex. 19.) In that letter, Behrens stated that the first 68 of the 85 counts asserted in the *Doe* lawsuit were excluded from coverage because they did not "qualify as 'Bodily Injury', 'Personal Injury' or an 'Occurrence' as defined by

the General Liability Policy," and because some of them fell within the "errors or omissions" exclusion. (*Id.* at Pg ID 661.) Behrens went on to state that the remaining 17 claims—all tort claims for intentional infliction of emotional distress—triggered coverage under the policy. (*See id.* at Pg ID 661.)

Also on May 17, 2013, Behrens emailed Phil Janness, a claims administrator at Gallagher Bassett who was assigned to the MAISL policies. Behrens informed the claims administrator that Selective had "set up a companion claim" under the 2010-2011 Primary Policy for the *Doe* lawsuit, "given the [*Doe* lawsuit's] ongoing allegations of 'school years 2010-2011 and 2011-2012'." (Compl. Ex. 22 at Pg ID 683.) She then stated that Selective would "have two files running concurrently, with two SIR's applicable. It is important to advise defense that all billings for the [*Doe* lawsuit] 'specifically' need to be billed to that file and paid by [Gallagher Basset] under that file." (*Id.*) Behrens advised that "[a]ll billings/work done on the GOHL file . . . need to be billed/paid to that file. If there is overlap, have them split billing 50/50 (or you can split payment) over the two terms. This is very important, when it comes to the erosion of the two SIR's." (*Id.*)

On June 24, 2013, Behrens sent an ROR to MAISL reserving Selective's rights under the 2011-2012 Primary Policy as regards the first amended complaint filed in the *Gohl* lawsuit. (Compl. Ex. 20.) Unlike the earlier letter regarding the *Gohl* lawsuit that was issued on January 17, 2013, this letter stated coverage

positions in two respects. First, the letter stated that the *Gohl* amended complaint's "allegations of willful and wanton, as well [as] requests for exemplary or punitive damages do not qualify as 'an occurrence' and any judgment for these will not be covered." (*Id.* at Pg ID 669.) Second, after quoting Endorsement 19—*i.e.,* the expected or intended harm exclusion with the corporal punishment exception—the letter stated: "***This incident as related in the Complaint triggers coverage for all defendants under the exception to the exclusion . . . as outlined above. It is related as a Corporal Punishment type of incident, and we are therefore providing defense and coverage to all defendants." (*Id.* (emphasis in original).)*

Also on June 24, 2013, Behrens sent an ROR to MAISL reserving Selective's rights under the 2011-2012 Primary Policy as regards the *Telerico* lawsuit. (Compl. Ex. 19.) As with the other ROR issued that same day regarding the *Gohl* lawsuit, Selective took the position in this letter that incidents alleged in the complaint were covered under the corporal punishment exception to Endorsement 19. (*Id.* at Pg ID 679.) The letter then stated that several of the claims in the *Telerico* lawsuit were nonetheless excluded from coverage:

> Please note that the pleas in COUNT I - concerning intentional assault and battery, as well as employment, discipline and awards concerning same, do not qualify as an "Occurrence" and are specifically excluded [under the "errors and omissions" exclusion].
> In COUNT II, III, IV, [and] VI [t]he allegations for violation of Civil Rights, as well as violation of State Law reporting requirements are specifically excluded [under the "errors and omissions" exclusion], as

29

well as parts of COUNT V concerning enforcement of policies, procedures, and regulations.

COUNT IX - Mandamus - does not qualify as an "occurrence" or "personal injury", and is not a covered count.

(*Id.*)

In summary, the record reflects that Selective sent MAISL four letters reserving its rights under the 2011-2012 Primary Policy in the first half of 2013: one on January 17 regarding the *Gohl* lawsuit, one on May 17 regarding the *Doe* lawsuit, one on June 24 regarding the first amended complaint filed in the *Gohl* lawsuit, and one on June 24 regarding the *Telerico* lawsuit. None of these four RORs referred to the SBLL Policy, except to note that a separate coverage letter regarding that policy would be issued if it had not been issued already. (The coverage letters concerning the SBLL Policy that ultimately were issued are discussed *supra*.) None of the four RORs refers to any of the Umbrella Policies.

All four of the RORs closed with essentially the same language:

Selective reserves all rights under policy S1323571 . . . including any rights, definitions, conditions, provisions or exclusions that may apply. We reserve the right to supplement this letter at any time. By inclusion of certain policy language within this letter we are not waiving any of our rights to any other policy language that may apply. If an amended lawsuit is received, please provide a copy for review of our coverage position.[7]

_____

[7] The only difference between the RORs with respect to this paragraph was that the May 17, 2013 ROR concerning the *Doe* lawsuit specified both 2010-2011 and 2011-

(Compl. Ex. 18 at Pg ID 653; Ex. 19 at Pg ID 661; Ex. 20 at Pg ID 670; and Ex. 21 at Pg ID 680.)

On June 24, 2013, the same date that the ROR for the *Telerico* lawsuit and the second ROR for the *Gohl* lawsuit were sent, Behrens emailed copies of those two RORs to Janness. (Compl. Ex. 23 at Pg ID 685.) Behrens stated: "These are the cases involving allegations against Teacher Sharon Turbiak and Paraprofessional Nancy Respondek. These two cases have the allegations within the 7-1-11 to 12 term, with singular events on each child." (*Id.*) She also stated: "These are going to be very expense heavy cases we have 6 defense firms due to multiple conflicts with the District Personnel. The three lawsuits (with 5 children) have been consolidated for discovery. We need full budgets from all firms within 30 days." (*Id.*)

Plaintiffs represent (though they do not offer clear evidence) that at Selective's instruction, "the six law firms invoiced MAISL monthly for their defense costs, and MAISL reviewed and paid their monthly invoices on the basis that Gohl/Telerico was a single 'occurrence' in the 2011-2012 policy year and all three Doe Plaintiffs were a single 'occurrence' in the 2010-2011 policy year." (Pls.' Mot. at Pg ID 2558.)

---

2012 as the relevant policy periods, whereas the other three RORs specified only 2011-2012 as the relevant policy period. (*See id.*)

## 2. Selective's Later Coverage Positions

The previous sub-section summarized the parties' communications in 2012 and 2013 regarding the scope of policy coverage—specifically, coverage under the SBLL Policy and under the 2010-2011 and 2011-2012 Primary Policies. (As noted, the record does not reflect any communications prior to April 2015 regarding the scope of any of the Umbrella Policies.) The following is a summary of communications regarding policy coverage beginning in April 2015, around which time Plaintiffs allege that Selective unilaterally and significantly changed its coverage positions.

### a) April 20, 2015 Letter

On April 20, 2015, MAISL received three letters regarding Selective's coverage positions as to each of the three underlying lawsuits under the Primary Policies and the Umbrella Policies. (Am. Compl. Exs. 24, 25, 26.) These letters were signed by attorneys Timothy Casey and Nicole Wilensky of Collins Einhorn Farrell PC ("**Collins Einhorn**"), who had been retained by Selective and also represent Selective in this action. The three April 20, 2015 letters were materially identical to one another, and the following description of the letter regarding the *Gohl* lawsuit ("**April 2015 *Gohl* Letter**") applies to the other two April 20, 2015 letters as well.

In the April 2015 *Gohl* Letter, Selective stated that there was no potential duty to defend the *Gohl* lawsuit under the 2011-2012 Umbrella Policy, but that Selective

would continue to provide a defense to the *Gohl* lawsuit under the 2011-2012 Primary Policy subject to certain limitations. (Compl. Ex. 24, April 2015 *Gohl* Letter at Pg ID 688-89.) (Selective did not reference the SBLL Policy in the April 2015 letters.) Selective then analyzed the provisions in the 2011-2012 Primary Policy and the 2011-2012 Umbrella Policy that justified these determinations. Because that analysis mostly reflects Selective's current coverage positions, and because it also applies to the *Doe* and *Telerico* lawsuits, it is summarized in depth below.

Specifically, Selective reserved its rights to disclaim coverage for the *Gohl* lawsuit under the 2011-2012 Primary Policy in several respects, including

- "[t]o the extent that the allegations in the Gohl Lawsuit do not allege 'bodily injury' or 'personal injury' as those terms are defined by the Selective Primary Policy" (*id.* at Pg ID 701-02);
- if bodily injury or personal injury did occur, to the extent that "such injury did not take place during the policy period" (*id.* at Pg ID 702);
- "to the extent that the alleged 'bodily injury' or 'personal injury' was not caused by an 'occurrence,'" (*id.*);
- "[t]o the extent that the alleged 'personal injury' arises out of the 'willful violation of a penal statute or ordinance'" under Exclusion 7 (*id.*); and
- to the extent that "damages, other than 'bodily injury' or 'personal injury,' aris[e] from any actual or alleged error or misstatement or act or omission or neglect or violation of any federal or state civil rights, or breach of duty by the LPS Defendants" under Exclusion 16. (*Id.*)

The April 2015 *Gohl* Letter stated more definite coverage positions with respect to two provisions in the 2011-2012 Primary Policy:

33

[T]o the extent that the Gohl Lawsuit is interpreted to allege an "occurrence" under the Selective Primary Policy, it is our position that coverage for the allegations asserted in the Gohl Lawsuit is precluded, in whole or in part, by Exclusion 17 - Expected or Intended Injury.[8] The Gohl Lawsuit alleges that the LPS Defendants committed intentional acts and had knowledge that an injury was certain to occur, but willfully disregarded that knowledge. Accordingly, it appears that any "bodily injury" or "personal injury" was "expected or intended from the standpoint of the Insured." Exclusion 17 does not apply to "bodily injury" resulting from corporal punishment. However, it is uncertain that the allegations asserted in the Gohl Lawsuit allege corporal punishment. To the extent that Exclusion 17 applies, there is no coverage for the LPS Defendants, in whole or in part, under the Selective Primary Policy for the Gohl Lawsuit. Accordingly, Selective reserves the right to disclaim coverage on this basis.

The Selective Primary Policy also contains an Abuse or Molestation endorsement (Policy Change Endorsement No. 11). Pursuant to this endorsement the General Aggregate Limit of Liability applicable to Abuse and Molestation Coverage is $1,000,000. It appears from the allegations and discovery in the Gohl Lawsuit that all the claims may be within the scope of this endorsement. To the extent that the matters in the Gohl Lawsuit fall within the abuse and molestation endorsement in the Selective Primary Policy, the total limit of liability available to all LPS Defendants collectively for all claims falling with this coverage, regardless of the number of occurrences, is $1,000,000.

---

[8] "Exclusion 17" in the 2011-2012 Primary Policy was set forth in (and thus created by) Endorsement 19 to that policy, and it is for this reason that the provision is referred to *supra* as "Endorsement 19." For the purposes of this Opinion and Order, the terms "Exclusion 17" and "Endorsement 19" are interchangeable, and both refer to the "Expected or Intended Injury" provision in the 2011-2012 Primary Policy.

(*Id.* at Pg ID 702-03.) The April 2015 *Gohl* Letter further noted that because there was "at least one potential occurrence in connection with the Gohl Lawsuit,"[9] MAISL was obligated to satisfy at least one SIR before Selective was obligated to pay any expenses or indemnity. (*Id.* at Pg ID 703.) As of April 20, 2015, Selective was "evaluating whether MAISL has exhausted the SIR." (*Id.* at Pg ID 703.)

Selective then turned to the 2011-2012 Umbrella Policy. Selective began by noting that because MAISL had not yet satisfied the "retained limit" threshold for the 2011-2012 Umbrella Policy, Selective did not currently have a duty to defend or indemnify. (Compl. Ex. 24 at Pg ID 703.) Then, Selective reserved its rights to deny coverage based on several of the same grounds as it invoked in the context of the 2011-2012 Primary Policy: to any extent the *Gohl* lawsuit did not allege "bodily injury" or "personal and advertising injury" within the policy period, and to any extent the allegations in the *Gohl* lawsuit did not constitute an "occurrence" under the policy. (*Id.* at Pg ID 703-04.)

In addition to these bases for disclaiming coverage, Selective identified (and reserved its rights under) various other exclusions in the 2011-2012 Umbrella Policy,

---

[9] The April 20, 2015 letter regarding the *Telerico* lawsuit also stated that there was "at least one potential occurrence" (Compl. Ex. 26 at Pg ID 743), while the April 20, 2015 letter regarding the *Doe* lawsuit stated that there were "at least three potential occurrences" (Compl. Ex. 25 at Pg ID 722). This is the only difference between the three April 20, 2015 letters that is material for present purposes.

a few of which are relevant here. First, citing the 2011-2012 Umbrella Policy's exclusion of claims arising from expected or intended injury, Selective stated that the *Gohl* plaintiff alleged that the defendants "committed intentional acts and had knowledge that an injury was certain to occur, yet willfully disregarded that knowledge. As a result, to the extent that the Plaintiff in fact suffered 'bodily injury' it appears that such 'bodily injury' was 'expected or intended from the standpoint of the Insured.'" Selective thus reserved the right to disclaim coverage insofar as this was the case. (*Id.* at Pg ID 704.) Second, Selective cited the Abuse or Molestation Exclusion in the 2011-2012 Umbrella Policy—which, unlike the 2011-2012 Primary Policy's provision capping abuse or molestation coverage at $1M, excluded such claims from coverage altogether—and noted that "[t]he allegations asserted in the Gohl Lawsuit appear to fall squarely within the Abuse and Molestation Exclusion." (*Id.*) Third, Selective stated that under the 2011-2012 Umbrella Policy's "sub-limit" exclusion, "[t]o the extent that the applicable limit of insurance of the Selective Primary Policy constitutes a 'sub-limit' as that term is defined in the Selective Umbrella Policy, the Selective Umbrella Policy does not apply." (*Id.*)

### b) June 12, 2015 Letter

On June 12, 2015, Selective (again through Collins Einhorn) sent MAISL a letter as "a follow-up to the May 18, 2015 in person meeting held to discuss MAISL/Gallagher Bassett's request for reimbursement of legal bills in connection

with [the underlying lawsuits,] the upcoming settlement conference for those

Lawsuits, and our other recent discussions on these matters." (Compl. Ex. 27, June

12, 2015 Letter.) The introduction to the letter stated that "[a]s requested by MAISL,

Selective is setting forth in greater detail, its coverage positions for [the underlying

lawsuits] under the potentially applicable Commercial General Liability Policies, the

School Board Legal Liability Policy, and the Umbrella Policies." (*Id.* at Pg ID 749.)

Selective began by discussing the 2010-2011 and 2011-2012 Primary

Policies, and stated that "[t]he language of [these] Policies governs the application

of the SIRs in this matter, regardless of how the claims were originally set up as one

SIR per policy year for administrative purposes or due to any email of Lene

Behrens." (*Id.*) The number of SIRs that MAISL was required to exhaust before

being entitled to reimbursement depended on the number of "occurrences" in the

underlying lawsuits. Selective noted that in the underlying lawsuits, "the immediate

causes of the alleged injuries to each of the five plaintiffs appear to be separate and

independent. The alleged abuse occurred in two separate classrooms, 3 to five

students, by two separate teachers, and took many different forms." (*Id.*) Selective

then concluded that because Michigan law and the policy language dictated that

there was one occurrence per plaintiff per applicable policy period in the underlying

lawsuits, and because "discovery [had] not revealed any actual abuse or injury other

than during the July 1, 2011 to July 1, 2012 policy period," MAISL was "responsible

for at least 5 SIRs, or $500,000 per claimant." (*Id.*) As of June 12, 2015, Selective's position was that MAISL had exhausted its SIRs for the *Gohl* lawsuit, but not for the *Doe* and *Telerico* lawsuits. (*See id.* at Pg ID 750-51.)

Selective then turned to the topic of defense costs, and contrasted its view "that defense costs erode limits" with MAISL's position "that based on a Common Policy Condition, policy limits would not be reduced by defense costs." (*Id.* at Pg ID 751.) Selective concluded, however, that "in this particular case, given that Section K provides that Selective will not pay more than the limit of liability, and since Selective will only be liable for Ultimate Net Loss, which includes defense costs, the total limit of liability must include defense costs." (*Id.*) Selective also noted that the abuse or molestation provision in the 2011-2012 Primary Policy applied to the underlying lawsuits, and that the $1,000,000 aggregate limit imposed by that provision is expressly defined to include both damages and expenses. (*See id.*)

Selective also discussed the SBLL Policy and the Umbrella Policies in the June 12, 2015 letter. Specifically, Selective took the position that coverage under the SBLL Policy was precluded entirely by that policy's own abuse or molestation exclusion. (*See id.* at Pg ID 751.) Even if the SBLL Policy did provide coverage, Selective then stated, there would still be an overall $1,000,000 limit on coverage for the 2012-2013 policy year: the SBLL Policy contains a separate clause entitled "Two or More Coverage Forms or Policies Issued By Us," which provides that if

38

any other policy issued by Selective or an affiliate applies to the same claim, "the aggregate maximum Limit of Insurance under all . . . policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy." (*Id.* at Pg ID 752.) Finally, Selective stated that because "the allegations asserted in the Lawsuits arise out of alleged abuse or molestation," they also fall within the Umbrella Policies' own abuse or molestation exclusion, and thus preclude coverage under all of the Umbrella Policies.

### c) July 17, 2015 Letter

On July 17, 2015, Selective, again through Collins Einhorn, sent MAISL another letter, this time as a response to a June 23, 2015 letter from MAISL.[10] (Compl. Ex. 28, July 17, 2015 Letter.) Selective's July 17, 2015 letter discussed only the Primary Policies, and not the Umbrella Policies or the SBLL Policy. In that regard, Selective principally addressed two issues: (1) the number of occurrences in the underlying lawsuits, which in turn affected which of the policy periods were triggered as well as the number of SIRs for which MAISL was responsible; and (2) the applicability of Endorsement 11 to the 2011-2012 Primary Policy, which imposed a $1,000,000 overall coverage limit on abuse or molestation liability.

Selective began its analysis of the first issue by stating that MAISL's

---

[10] MAISL's June 23, 2015 letter does not appear to be in the record before this Court.

statements in its June 23 letter, in which MAISL characterized Selective's coverage positions as being that "(1) there are five occurrences alleged in the three lawsuits and (2) the underlying lawsuits only allege actual abuse or injury during the 2011-2012 policy period, are incorrect." (*Id.* at Pg ID 755.) Instead, Selective stated, based on "the allegations in the underlying complaints, and on the actual facts developed in discovery as we understand them, both the 2010-2011 and 2011-2012 [Primary] Policies are triggered by the underlying lawsuits for defense, including all SIR requirements, but only the 2011-2012 policy would be triggered for indemnity/settlement payments." (*Id.*)

Selective's explanation for this conclusion appears to be based on the differences between what facts had been alleged in the underlying lawsuits and what facts were later supported by evidence turned up in discovery. One the one hand, Selective argued that the *Doe* and *Telerico* lawsuits alleged conduct during both the 2010-2011 and the 2011-2012 policy periods, while the *Gohl* lawsuit only alleged conduct during the 2011-2012 policy period. Thus, based on Selective's position that there was one occurrence per plaintiff per triggered policy period, there was one occurrence in the *Gohl* lawsuit (one plaintiff over one policy period); six occurrences in the *Doe* lawsuit (three plaintiffs over two policy periods); and two occurrences in the *Telerico* lawsuit (one plaintiff over two policy periods). This made for a total of nine occurrences, which in turn made MAISL responsible for a total of nine SIRs.

(*See id.*) On the other hand, Selective argued, discovery to date had not revealed any actual evidence of relevant conduct by the defendants in the 2010-2011 policy period, and so assuming that continued to be the case, any indemnification for damages (as opposed to reimbursement for defense costs) could only be paid under the 2011-2012 Primary Policy. (*See id.*)

Thus, Selective's position as stated in the July 17, 2015 letter was that the underlying lawsuits alleged four occurrences (three from *Doe* and one from *Telerico*) that triggered defense under the 2010-2011 Primary Policy, which in turn generated four $500,000 SIRs that MAISL would have to pay before coverage under that policy was triggered; and that there were five occurrences that triggered the 2011-2012 Primary Policy, resulting in five $500,000 SIRs (one from *Gohl*, three from Doe, and one from *Telerico*) under that policy. Selective then stated that MAISL had satisfied the SIR for the *Gohl* lawsuit but had yet to satisfy any of the SIRs for the *Doe* or *Telerico* lawsuits (in either applicable policy period), and included a table setting forth the amounts remaining in each SIR. (*See id.* at 756.)

The other central issue addressed in the July 17, 2015 letter was the applicability of the abuse or molestation limitation in Endorsement 11 to the 2010-2011 and 2011-2012 Primary Policies. Selective took two positions on Endorsement 11: (1) that it applied to the underlying lawsuits by virtue of their abuse allegations, and (2) that its $1,000,000 per-policy limitation included defense costs, and not

41

merely damages, as MAISL had argued. On the first point, Selective rejected MAISL's argument that Endorsement 11 only applied where the abuse or molestation was sexual in nature, citing Michigan law for the proposition that courts interpret insurance policies in accordance with the plain meaning and common understandings of their language, and quoting definitions of both "abuse" and "molestation" from Random House Webster's Unabridged Dictionary to show that the terms did not necessarily have sexual components. (*See id.* at Pg ID 758.) Selective also took the position that certain other endorsements to the policy that MAISL had argued limited the definition of abuse or molestation in this way did not in fact have this effect, since those endorsements operated independently from Endorsement 11, and the portions of those endorsements that MAISL had cited applied only to those endorsements and not to any others. (*See id.*)

Finally, Selective stated that the $1,000,000 General Aggregate Limit imposed by Endorsement 11 included defense costs and not merely damages: the policy defines "General Aggregate Limit" to include "expenses," and defines "expenses" as "costs incurred by the Insured in the defense and settlement of claims." (*Id.* at Pg ID 757.) And in response to MAISL's argument that Endorsement 11 stated that "[a]ll other terms not affected by these changes remain the same," Selective stated that any other provisions of the policy that conflicted with Endorsement were, by definition, "affected by these changes," and therefore rejected

that argument as unavailing. (*Id.* at Pg ID 757-58.)

Selective closed the July 17, 2015 letter by stating that "[t]here are significant coverage issues outstanding in this matter and MAISL has significant exposure as to SIRs and in the underlying lawsuits. Given the urgency of resolving the defense cost payment issues, Selective reiterates its request that MAISL agree to Selective's interim agreement as proposed on July 8, 2015." (*Id.* at Pg ID 759.) That proposed "interim agreement" is not in the record before this Court, but the concluding section of the letter sheds some light on what Selective proposed in it:

> Selective thus again requests that MAISL contribute to the outstanding and future defense costs on the Doe and Telerico lawsuits on a 50/50 basis with Selective, subject to a full and complete mutual reservation of rights. With respect to the current underlying suits settlement demand and your position it is within the Selective policy limits, it is not within the Selective limits, given endorsement 11 and the other positions set forth herein. MAISL has exposure for settlement/indemnity payments above the $1 million aggregate (inclusive of defense) Selective policy limit, and we again request that MAISL agree to contribute along with Selective (and presumably other carriers who attended the settlement conference) to the settlement of the underlying lawsuits, subject to a full and complete mutual reservation of rights to then resolve the coverage/any reimbursement issues.

(*Id.* at Pg ID 759.)

Selective represents in its briefs on the instant cross-motions that since the filing of the *Telerico* lawsuit (but presumably after it drafted the 2015 letters discussed above), Selective learned that the *Telerico* plaintiff did not attend Webster

43

Elementary School during the 2010-2011 school year. Accordingly, Selective now agrees that as to the *Telerico* lawsuit, "only the 2011-2012 Primary Policy is potentially applicable." (ECF No. 59, Def.'s Mot. at Pg ID 2797; ECF No. 65, Def.'s Resp. at Pg ID 2918.)

**E. Relevant Procedural History of the Instant Case**

Plaintiffs filed the initial complaint in this action on February 1, 2016 (ECF No. 1, Compl.), and then filed an Amended Complaint on February 24, 2017 (ECF No. 8, Am. Compl.). (The Amended Complaint appears to have been filed solely for formatting purposes, and the substance of it is materially identical to that of the original complaint.) The Amended Complaint asserts eight counts: three counts seeking declaratory judgment regarding the 2011-2012 Primary Policy, the SBLL Policy, and the Umbrella Policies respectively (Counts I-III); one count seeking declaratory judgment as to the Loss Fund Policy Aggregate provision in the 2011-2012 Primary Policy (Count IV); one count for breach of contract as regards the 2011-2012 Primary Policy and the SBLL Policy (Count V); one count for contract reformation as regards the 2011-2012 Primary Policy and the 2011-2012 Umbrella Policy (Count VI); one count for estoppel as regards different provisions in the 2011-2012 Policy and the 2011-2012 Umbrella Policy (Count VII); and one count for estoppel as regards the 2010-2011 and 2011-2012 Primary Policies and the 2011-2012 Umbrella Policy (Count VIII).

On April 19, 2016, Selective answered the Amended Complaint, asserted affirmative defenses, and filed a Counterclaim. (ECF No. 10, Countercl.) In the Counterclaim, Selective asserts four counts: three counts seeking declaratory judgment as regards the Primary Policies, the SBLL Policy, and the Umbrella Policies respectively (Counts I-III); and an implied-in-fact contract claim as regards reimbursement of defense costs that Selective has paid for MAISL (Count IV). Although the issues presented by Selective's declaratory judgment counterclaims overlap to a substantial degree with those presented by Plaintiffs' declaratory judgment claims, none of the parties have specifically sought summary judgment as to Selective's counterclaims, and for that reason, they are outside the scope of this Opinion and Order.

On April 28, 2017, the Court referred this matter to Magistrate Judge Stephanie Dawkins Davis for the purposes of conducting a settlement conference. (ECF No. 46.) A settlement conference was held on July 18, 2017 and continued to July 28, 2017, at which time it was continued again to August 7, 2017. Three days prior to the continuation date, however, the settlement conference was cancelled. The docket does not indicate the reason for the cancellation.

Pursuant to a Stipulated Order entered on May 30, 2017, the dispositive motion cut-off date in this action was August 18, 2017. On August 17, 2018, Plaintiffs filed a Joint Motion for Partial Summary Judgment as to

Defendant/Counter-Plaintiff's Duty to Defend. (ECF No. 57, Pls.' Mot.) Selective filed its own Motion for Summary Judgment on August 18. (ECF No. 59, Def.'s Mot.) The same day, Plaintiffs filed an Amended Joint Motion for Partial Summary Judgment as to Defendant/Counter-Plaintiff's Duty to Defend, which incorporated the motion they had filed the previous day, and was filed only to add a statement that Plaintiffs had "previously explained the nature of the motion and its legal basis to Selective, and requested but did not obtain concurrence in the relief sought," which Plaintiffs had not included in their initial motion. (ECF No. 60, Pls.' Am. Mot. at Pg ID 2894.)

The parties filed timely briefs on Plaintiffs' Joint Motion (ECF No. 65, Def.'s Resp.; ECF No. 69, Pls.' Reply), as well as timely briefs on Selective's Motion (ECF No. 66, Pls.' Resp.; ECF No. 70, Def.'s Reply). This Court conducted a hearing on the parties' Motions on December 14, 2017. (ECF No. 74, Transcript of December 14, 2017 Hearing.) Following the hearing, the Court referred the parties to facilitative mediation, but the parties did not reach a resolution.

## II.   LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of

46

establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

When the Court is faced with cross-motions for summary judgment, the Court

"must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). "The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute." *Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (citing *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). In this context, a plaintiff and a defendant have different burdens:

> In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

> When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense").

> The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing

48

that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely*, 150 F. Supp. 3d at 849-50.

Finally, all evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.").

## III. Discussion

Plaintiffs assert eight claims in the Amended Complaint: four for declaratory judgment (Counts I-IV), one for breach of contract (Count V), one for reformation (Count VI), and two for estoppel (Counts VII and VIII). Plaintiffs make clear in the introduction to their Joint Motion that their estoppel claims are pled in the alternative to the other claims. (*See* Pls.' Mot. at Pg ID 2535.) In other words, Plaintiffs argue that even if Selective's stated coverage positions are supported by the language of the policies (which Plaintiffs maintain they are not), Selective should still be estopped from taking those coverage positions because of Plaintiffs' detrimental

reliance on the coverage positions that Selective took earlier.

The scope of this Opinion and Order is limited in several respects. First, as noted *supra*, none of the parties have moved for summary judgment on Selective's counterclaims; thus, although the Court's rulings as to Plaintiffs' declaratory judgment claims may incidentally affect Selective's declaratory judgment counterclaims given the issue overlap between them, Selective's declaratory judgment counterclaims are not addressed in this Opinion and Order. Second, the parties have not addressed two of Plaintiffs' eight claims in their summary judgment motions: Count IV ("Declaratory Judgment (Loss Fund Policy Aggregate)") and Count V ("Breach of Contract (2011-2012 Primary Policy and SBLL Policy") of the Amended Complaint. These two claims are therefore outside the scope of this Opinion and Order as well. Finally, although the briefs demonstrate a clear factual dispute as to precisely how much Selective has paid Plaintiffs thus far, there is insufficient evidence in the record for the Court to adjudicate this dispute.

Thus, the scope of this Opinion and Order is limited to six of Plaintiffs' eight claims: three claims for Declaratory Judgment (Counts I-III), one claim for Reformation (Count VI), and two claims for Estoppel (Counts VII and VIII). Further, regarding Plaintiffs' three declaratory judgment counts specifically, the Court notes that these claims as pled in the Amended Complaint seek broad and varied declaratory relief, including requested declaratory judgments that the parties

have not argued or even raised in the instant motions. This Opinion and Order addresses only those issues that the parties have adequately briefed.

## A.    Selective's Motion for Summary Judgment (ECF No. 59)

Selective requests summary judgment as to three of Plaintiffs' four claims for Declaratory Judgment (Counts I-III), Plaintiffs' claim for Reformation (Count VI), and both of Plaintiffs' claims for Estoppel (Counts VII-VIII). To the extent that the parties raise the same or similar arguments in their briefs on Selective's Motion and Plaintiffs' Joint Motion, those arguments are discussed in the analysis of Selective's Motion that follows. Broadly speaking, Selective's Motion for Summary Judgment will be largely granted as to Plaintiffs' declaratory judgment claims, with the notable exception of the issue of whether defense costs erode the General Aggregate Limit imposed by the "abuse or molestation" limitation in Endorsement 11—on that issue, the Court agrees with Plaintiffs that they do not. Further, Selective's Motion for Summary Judgment will be granted as to Plaintiffs' reformation claim, and granted as to Plaintiffs' estoppel claims, subject to another significant exception: Plaintiffs' estoppel claims concerning the Umbrella Policies, on which the Court finds that fact issues preclude summary judgment for either party.

### 1.    Declaratory Judgment Claims (Counts I-III)

The three declaratory judgment claims at issue in this Opinion and Order concern the Primary Policies (Count I), the SBLL Policy (Count II), and the

Umbrella Policies (Count III). To the extent that its Motion for Summary Judgment is directed at these claims, Selective requests that this Court find that

(1) there is one occurrence and one Self Insured Retention (SIR) per plaintiff per triggered policy period; (2) the Abuse and Molestation Endorsement applies to the underlying lawsuits and limits any potential exposure for defense and indemnity combined, to $1,000,000 per policy period; (3) coverage is precluded under the school board legal liability policy and (4) coverage is precluded under the umbrella policy.

(Def.'s Mot. at 1-2, Pg ID 2789-90.)

The declaratory judgment claims in Plaintiffs' Amended Complaint are asserted under 28 U.S.C. § 2201, which provides that, subject to various exceptions not relevant here, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* The declaratory judgment claims in this action require the Court to interpret language in the applicable insurance policies, and several well-established legal principles guide that interpretation.

The parties agree that Michigan law governs the substantive issues in this case. "The Michigan courts engage in a two-step analysis when determining coverage under an insurance policy: (1) whether the general insuring agreements

cover the loss and, if so, (2) whether an exclusion negates coverage." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, No. 17-2421, 2018 WL 3978211, at *1 (6th Cir. Aug. 21, 2018) (citing *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 382 (1997)). As a general matter, "[a]n insurance policy is much the same as any other contract." *City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197–98, 702 N.W.2d 106, 113 (2005) (quotation marks omitted) (quoting *Auto-Owners Ins. Co. v. Churchman,* 440 Mich. 560, 566 (1992)). "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *Id.* (quotation marks omitted) (quoting *McIntosh v. Groomes,* 227 Mich. 215, 218 (1924). With this in mind, the Michigan Supreme Court has held that "[i]f the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning; but if it is ambiguous, testimony may be taken to explain the ambiguity." *Id.* at 197-98 (alteration in original) (quotation marks omitted) (quoting *New Amsterdam Cas. Co. v. Sokolowski,* 374 Mich. 340, 342 (1965)). At the same time, Michigan courts "will not create ambiguity where the terms of the contract are clear." *Id.* at 198.

The Michigan Supreme Court has recognized "the general rule of construction applicable to insurance policies that an ambiguous provision in an insurance contract must be construed against the drafting insurer and in favor of the insured," though it has also cautioned that "if the provision is clear and unambiguous, the terms are to

be taken and understood in their plain, ordinary, and popular sense." *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654 (1993). "A contract is said to be ambiguous when its words may reasonably be understood in different ways." *Id.* It follows that "[i]f a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage." *Id.*

Moreover, "[a]n ambiguity may either be patent or latent. [E]xtrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document. However, extrinsic evidence may be used to show that a latent ambiguity exists." *Shay v. Aldrich*, 487 Mich. 648, 667 (2010); *see also City of Grosse Pointe Park*, 473 Mich. at 198 (employing the patent/latent ambiguity analysis to interpret insurance policy provisions). "A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the 'necessity for interpretation or a choice among two or more possible meanings.'" *Shay*, 487 Mich. at 668 (quoting *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 575 (1964)). In *Shay*, the Michigan Supreme Court described the inquiry in this way:

> To verify the existence of a latent ambiguity, a court must examine the
> extrinsic evidence presented and determine if in fact that evidence
> supports an argument that the contract language at issue, under the

54

circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue.

*Id.* (citing *Goodwin, Inc. v. Orson E. Coe, Pontiac, Inc.*, 392 Mich. 195, 206, 209-10 (1974)); *see also id.* (defining a latent ambiguity as "one 'that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed'") (quoting *City of Grosse Pointe Park*, 473 Mich. at 198).

As noted, Selective's Motion raises four issues as to Plaintiffs' declaratory judgment claims: (1) the number of "occurrences" in the underlying lawsuits, (2) the effect of the abuse/molestation provision in Endorsement 11, (3) the extent of coverage under the SBLL Policy, and (4) the extent of coverage under the Umbrella Policies. These issues will be considered in turn.

### a) Number of Occurrences in the Underlying Lawsuits

A central dispute in this case is over the precise number of "occurrences" engendered by the three underlying lawsuits. This is significant for at least two reasons. First, in order for coverage under one of the Primary Policies to be triggered at all, the bodily injury, personal injury, or property damage giving rise to the claim against Plaintiffs "must be caused by an occurrence during the term of" the particular Primary Policy. (2010-2011 Primary Policy at Pg ID 1036; 2011-2012 Primary Policy at Pg ID 109.) Second, each "occurrence" generates a $500,000 SIR that

Plaintiffs must exhaust before Selective's obligations under the relevant Primary Policy are triggered: both Primary Policies provide that "[i]n consideration of the reduced premium charged," Selective's obligation to "pay for damages . . . resulting from any occurrence or covered cause of loss is limited to the payment of that portion of the Ultimate Net Loss which, subject to the Loss Fund Aggregate, is in excess of the Self Insured Retention amount" specified in the policy. (2010-2011 Primary Policy at Pg ID 1011; 2011-2012 Primary Policy at Pg ID 84.) The Primary Policies define "occurrence" as "an accident; . . . a happening; . . . an event; or . . . continuous or repeated exposure to conditions, [which] unexpectedly or unintentionally lead[s] to bodily injury or property damage during the term of this insurance. All exposure to substantially the same general conditions of one location is one occurrence." (2010-2011 Primary Policy at Pg ID 1043; 2011-2012 Primary Policy at Pg ID 116.)

Having acknowledged that the plaintiff in the *Telerico* lawsuit did not attend Webster Elementary in the 2010-2011 school year (*see* Def.'s Mot. at Pg ID 2797), Selective's current coverage position is that the underlying lawsuits entail eight occurrences (and therefore eight SIRs) in total: three for the *Doe* plaintiffs in the 2010-2011 period; and one for each of the three *Doe* plaintiffs, one for the *Gohl* plaintiff, and one for the *Telerico* plaintiff in the 2011-2012 period. By contrast,

Plaintiffs' position (at least for the purposes of their declaratory judgment claim[11])
is that "the claims of the five plaintiffs in the Underlying Lawsuits constitute a single
occurrence for each plaintiff under the 2011-2012 [Primary] Policy for a total of five
occurrences," and there were no occurrences during the 2010-2011 period. (Am.
Compl. at 21, Pg ID 795.) Since there is no dispute as to the five occurrences in the
2011-2012 period, the dispute is over the three occurrences that Selective argues
took place in the 2010-2011 period.

Plaintiffs' primary arguments as regards the number of occurrences are
estoppel arguments rather than policy interpretation arguments, and the estoppel
claims are analyzed below. Plaintiffs do make one argument based on the policies
themselves, however: that the *Doe* lawsuit does not implicate the 2010-2011 Primary
Policy because no evidence has surfaced in the *Doe* lawsuit that any incidents took
place during the 2010-2011 policy period, and the complaint in the *Doe* lawsuit only
vaguely alleges wrongful conduct towards the plaintiffs "[o]n multiple occasions in
the 2010-2011 and/or 2011-2012 school year(s)." (Compl. Ex. 9, *Doe* Complaint ¶¶
50, 52, 54, 56, 58.)

---

[11] In the context of their estoppel claims, Plaintiffs take the alternative position that
there are only "two occurrences and two SIRs," asserting that this was Selective's
initial coverage position and that Selective must be estopped from taking a different
one. (Pls.' Mot. at 24, Pg ID 2569.) The estoppel claims are discussed *infra*.

This argument is unavailing. The duty to defend is broad, and "[i]f the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense. This is true even where the claim may be groundless or frivolous." *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51 (1996); *see also Ziebart Int'l Corp. v. CNA Ins. Companies*, 78 F.3d 245, 248 (6th Cir. 1996) ("Michigan law provides that an insurer's duty to defend 'depends upon the allegations of the complaint' against the insured, and that a defense must be provided if those allegations 'even arguably come within the policy coverage.'") (quoting *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich. App. 136, 142 (1980)). The allegations in the *Doe* lawsuit, even if unspecific, are sufficient to impose a duty to defend on Selective, which in turn justifies Selective's position that there were occurrences in the 2010-2011 policy period. Moreover, however little evidence has emerged that any incidents took place in that period—or indeed however much evidence has emerged that none did—the duty defend still exists as long as "coverage is possible." *Id.* at 451. The record contains no indication that there has been any legal determination, in the *Doe* lawsuit itself or otherwise, establishing that no "occurrences" took place as to any of the plaintiffs in that action during the 2010-2011 policy year.

Thus, it is still the case that "coverage is possible" as to the *Doe* lawsuit, and the relevant policy terms contain no ambiguities that would justify a finding to the

contrary. To the extent that Selective's Motion seeks a declaration that the underlying lawsuits involved eight occurrences, the Motion will be granted.[12]

### b) Endorsement 11 (Effect on General Aggregate Limit)

Likely the most critical provision in any of the insurance policies at issue in this case is Endorsement 11 (entitled "Abuse or Molestation") to the 2010-2011 and 2011-2012 Primary Policies.[13] Selective contends that Endorsement 11 establishes a

---

[12] At the December 14, 2017 hearing on the instant Motions, Plaintiffs' counsel argued that just as Selective concluded that the 2010-2011 policies were not triggered by the *Telerico* lawsuit—i.e., after determining that the *Telerico* plaintiff did not actually attend Webster during that academic year—the same reasoning should compel a conclusion that the 2010-2011 policies were not triggered by the *Doe* lawsuit, because the filings in the *Doe* litigation suggest that the three *Doe* plaintiffs were all in the same classroom only during the 2011-2012 policy year, and because no specific incidents during the 2010-2011 policy year have been pled or proven. (*See* ECF No. 74, Transcript of December 14, 2017 Hearing at 57:6-20.)

When it comes to the duty to defend, "[t]he insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51 (1996). Under this principle, there is a distinction between the discovery of evidence that definitively precludes coverage of a particular claim (such as the fact that the *Telerico* plaintiff did not attend Webster during the 2010-2011 year) and the simple fact that the claim has not been proven (as is the case with the *Doe* plaintiffs' claims regarding the 2010-2011 year). At this time, this distinction justifies Selective's position that the *Doe* lawsuit implicates the 2010-2011 policy year. The Court notes, however, that if and when it is no longer the case that "coverage is possible" as to the *Doe* lawsuit's 2010-2011 allegations, Selective will be obligated to adjust its position accordingly.

[13] The analysis of Endorsement 11 in this Opinion and Order refers to the 2011-2012 Primary Policy. (*See* 2011-2012 Primary Policy at Pg ID 151.) The 2010-2011 Primary Policy has an identical Endorsement 11 provision (*see* 2010-2011 Primary Policy at Pg ID 1077), so to whatever extent the parties' overall rights and obligations implicate the 2010-2011 Primary Policy, this analysis applies to that policy as well.

$1,000,000 General Aggregate Limit on its obligations under each of the Primary Policies that is triggered by the underlying lawsuits. By its terms, Endorsement 11 sets the General Aggregate Limit of the 2011-2012 Primary Policy—which is otherwise "N/A"—at $1,000,000 for "abuse or molestation coverage" specifically. (2011-2012 Primary Policy at Pg ID 83, 151.) The policy gives "abuse or molestation coverage" two alternative definitions: (1) "the actual or threatened abuse of molestation by anyone of any person while in the care, custody or control of any insured"; or (2) the negligent employment, investigation, supervision, reporting or failure to report, or retention of a person who committed such actual or threatened acts, and for whom the insured was legally responsible. (*Id.*) Citing these provisions, Selective argues that the allegations in each of the three underlying lawsuits bring them within Endorsement 11, which in turn caps Selective's obligations under any triggered Primary Policy to $1,000,000.

Plaintiffs make several distinct arguments that Endorsement 11 does not apply in this case at all, and those arguments (as well as Selective's responses to them) are considered in turn below.

### i.   *"Abuse of molestation"*

Plaintiffs argue that the effect of Endorsement 11 is limited based on what Selective characterizes as a typographical error: Endorsement 11 defines abuse or molestation coverage as "actual or threatened abuse of molestation." The use of the

word "of" in that phrase, Plaintiffs maintain, is not a typographical error at all, or at least should not be treated as one, and since the abuse/molestation provisions in the SBLL Policy and Umbrella Policies do use the phrase "abuse or molestation," Selective should be presumed to have intended to use the word "of" rather than "or." And, apparently interpreting "abuse of molestation" to mean simply "molestation," Plaintiffs argue that the absence of any allegations of molestation in the underlying lawsuits renders Endorsement 11 inapplicable.

Putting aside the fact that Plaintiffs' interpretation of the somewhat strained phrase "abuse of molestation" renders the word "abuse" superfluous, Plaintiffs' argument concerning the use of the phrase "abuse *or* molestation" in the Umbrella and SBLL Policies cuts both ways: the use of that phrase in otherwise identical provisions in the other policies suggests that the use of the word "of" in the Primary Policies was an error just as strongly as it suggests that Selective intended it. The argument also fails to account for the fact that notwithstanding the "of," the phrase "abuse *or* molestation" is used three separate times in Endorsement 11 itself, including in the title. In light of these considerations, the Court finds that this language in Endorsement 11 cannot "reasonably be understood in different ways" as would render it ambiguous. *Superior Communications v. City of Riverview, Michigan*, 881 F.3d 432, 438 (6th Cir. 2018) (applying Michigan law). *See also Kovelle v. Hartford Ins. Co.*, No. 242749, 2003 WL 22928874, at *1 (Mich. Ct. App.

61

Dec. 11, 2003) (explaining, as regards a policy provision reducing a liability limit by "all sums paid because *or* the bodily injury," that "the word 'or' . . . is easily recognized as a typographical error because its appearance renders the sentence meaningless" and that "from the surrounding context, it is apparent that 'or' was intended to be 'of'") (emphasis added).

### ii.    *Amendment of General Aggregate Limit*

Plaintiffs argue that Endorsement 11 could not have amended the General Aggregate Limit set forth earlier in the policy because the latter did not exist: "because there is no applicable (N/A) General Aggregate Limit for the General Liability coverage, there is no General Aggregate Limit to be amended by Endorsement No. 11." (Pls.' Resp. at Pg ID 3103.)

This assertion is unsupported by case law or argument, and Plaintiffs have offered no persuasive explanation as to why a General Aggregate Limit that is normally non-applicable cannot be rendered applicable (and set at a specified amount) by a policy amendment like Endorsement 11. This argument lacks merit.[14]

---

[14] The Court notes that Endorsement 11 provides that "the General Aggregate Limit of Liability applicable to Abuse or Molestation coverage only is amended to $1,000,000 in lieu of $3,000,000." (2011-2012 Primary Policy at Pg ID 151.) It is unclear what "in lieu of $3,000,000" is meant to refer to, and between that phrase and the clear typographical error of "abuse of molestation," the 2011-2012 Primary Policy appears to rely upon unfortunately inartful drafting in some of its critical provisions. Still, the reference to "$3,000,000" does not create ambiguity either: the only alternative to reading Endorsement 11 as modifying the General Aggregate

### iii.   *Abuse or molestation in the underlying lawsuits*

The parties also dispute whether the alleged conduct at issue in the underlying lawsuits bring them within the scope of Endorsement 11's "abuse or molestation" exclusion at all. There are several dimensions to the parties' arguments in this regard.

Plaintiffs contend that Endorsement 11 is limited to abuse or molestation of a sexual nature, and their primary support for this argument is evidence that Behrens, the claims specialist initially assigned to the policies at issue here, understood Endorsement 11 to be limited in this way. (*See* Pls.' Mot. at 10, Pg ID 2555 (citing Behrens Dep. 71:8-23, 78:20-81:13, 106:23-111:10).) The extent to which this fact bears on Plaintiffs' estoppel claims is addressed in this Opinion and Order's discussion of those claims, *infra*. As regards the policy interpretation issues presented by Plaintiffs' declaratory judgment claims, however, evidence of Behrens's subjective understanding of the meaning of Endorsement 11 does not demonstrate an ambiguity. *See Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 428 (6th Cir. 2016) ("[I]n the ordinary course, a latent ambiguity must be revealed by objective means—for instance, an admission, uncontested evidence, or the testimony of a disinterested third party. As we have said, interpreting Michigan law, one party's 'subjective understanding' of what the

---

Limit that *is* set forth in the policy (i.e., "N/A") is to read Endorsement 11 as having no effect at all. The Court is not persuaded that this is a reasonable interpretation.

contract meant is plainly 'insufficient to create a latent ambiguity.'") (quoting *Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc.*, 568 F. App'x 398, 402 (6th Cir. 2014)).

Selective correctly points out that Endorsement 11 contains no language that would suggest that its scope is limited to abuse or molestation of a sexual nature. Selective also cites Michigan case law that stands for the proposition that "the plain meaning of 'abuse or molestation' is not restricted to sexual acts or behaviors." *Cincinnati Ins. Co. v. Hall*, No. 297600, 2011 WL 2342704, at *3 (Mich. Ct. App. June 14, 2011). In reaching this conclusion, the court in *Hall* explained:

> Both "abuse" and "molestation" have multiple possible definitions that include, but are not limited to, those which involve a sexual connotation. The Random House Webster's College Dictionary defines the verb "abuse" as "to use wrongly or improperly," "to treat in a harmful or injurious way," "to speak insultingly or harshly to or about," and "to commit sexual assault on." This demonstrates that abuse need not be "sexual." The same dictionary defines "molest" as "to bother, interfere with, or annoy," "to make indecent sexual advances to," and "to assault sexually."

*Id.* at *4 (citations omitted). The *Hall* court thus concluded that

> [U]nwanted sexual contact might be what 'abuse or molestation' is most commonly used to describe. However, the plain meanings of the words encompass a broader range of possible acts and behaviors, and we find no authority requiring their use in an insurance policy to be artificially restricted to only sexual acts or behaviors.

Id. at *5. In light of the plain text of Endorsement 11 and the persuasive authority of *Hall*, the Court agrees that Endorsement 11 is not on its face limited in scope to abuse or molestation of a sexual nature.

Plaintiffs do not contest that *Hall* stands for the proposition for which Selective cites it, but they do argue that a subsequent decision by the Michigan Court of Appeals in the *Hall* litigation is detrimental to Selective's case in a different respect. Specifically, Plaintiffs maintain that in *Cincinnati Ins. Co. v. Hall*, No. 308002, 2013 WL 3107640 (Mich. Ct. App. June 20, 2013) (hereinafter "*Hall II*"), the Michigan Court of Appeals refined its definition of "abuse or molestation" by holding that the phrase "must be interpreted as implying intentional mistreatment and cannot imply mere accidental or negligent conduct." (Pl.'s Resp. at 17, Pg ID 3100 (quoting *Hall II*, 2013 WL 3107640, at *6).) Plaintiffs then argue that Endorsement 11 does not apply because none of the underlying lawsuits allege conduct that constitutes "abuse or molestation" within the meaning of the term as it was analyzed in *Hall II*. Plaintiffs note in particular that in affirming the district court's dismissal of the federal claims in *Gohl* on summary judgment, the Sixth Circuit found that Turbiak had a "pedagogical justification" for her conduct; that Turbiak was making "a good-faith effort to maintain or restore discipline" and was not acting "maliciously and sadistically for the very purpose of causing harm"; and that J.G. did not suffer a "serious injury" as a result of Turbiak's actions. *Gohl*, 836

F.3d at 678–79 (quoting *Domingo v. Kowalski*, 810 F.3d 403, 411 (6th Cir. 2016)).

*Hall II* is not availing to Plaintiffs. The central holding of *Hall II* is that the term "abuse or molestation" in an insurance policy "must be interpreted as implying intentional mistreatment and cannot imply mere accidental or negligent conduct." *Hall II*, 2013 WL 3107640, at \*6. The particular conduct alleged in the *Hall* litigation illustrates the proposition:

> The instant case arises out of an underlying action, which in turn arose out of a permanent eye injury sustained by Kelly Foster Hall (Kelly) while in SRI's care. SRI provides occupational and social training to developmentally disabled adults, its "consumers." Kelly and David Egbuche, two of SRI's customers, were in a van being operated by Michael Davis, an SRI employee, on their way to an SRI training facility. Egbuche became annoyed by Kelly rocking and making noises, and he complained to Davis, who allegedly told Egbuche to "handle it" or "take care of it." Egbuche then struck Kelly in the face, breaking Kelly's glasses and injuring his eye.

*Hall II*, 2013 WL 3107640, at \*1 (quoting *Hall*, 2011 WL 2342704, at \*1). The *Hall* court found that Davis's actions as described above "clearly fall into the definitions of 'abuse' and 'molestation.'" *Hall*, 2011 WL 2342704, at \*4. The *Hall II* court agreed, and contrasted Davis's alleged actions with hypothetical "negligent conduct"—for example, if Davis had "instead negligently injured Hall in attempting

to get him on or off the bus through mere negligence"—which would not fall within the "abuse or molestation" provision at issue in the case.[15]

This Court finds that the conduct alleged in the underlying lawsuits falls within the definitions of "abuse or molestation" articulated by the Michigan Court of Appeals in *Hall* and *Hall II*. The operative complaints in the *Doe* and *Telerico* lawsuits clearly allege abuse rather than negligence or accidental harm. The *Doe* complaint alleges that defendants Turbiak and Respondek used their positions as teacher and classroom aide respectively "to physically and/or emotionally abuse [the three plaintiffs], which constituted criminal child abuse."[16] (*Doe* Complaint ¶¶ 50, 52, 54, 56, 58.) The *Telerico* complaint alleges that at "[Turbiak]'s express or implied direction [Respondek] physically grabbed [the plaintiff] by his arm, hit him on his buttocks area and yelled directly in his face," and that "[a] short time later

_____

[15] Notably, the "abuse or molestation" provision in *Hall* and *Hall II* was materially identical to Endorsement 11 in this case. *See Hall II*, 2013 WL 3107640, at *1.

[16] Plaintiffs point out that with respect to one of the three plaintiffs in the *Doe* lawsuit (C.W.), no specific incident of misconduct has been articulated. It is true that "[t]he duty to defend and indemnify is not based solely on the terminology used in the pleadings in the underlying action." *Matouk v. Michigan Mun. League Liab. & Prop. Pool*, 320 Mich. App. 402, 418 (2018) (internal quotation marks omitted) (quoting *Fitch v. State Farm Fire & Cas. Co.*, 211 Mich. App. 468, 471 (1995)). But it is still the case that "[t]he duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured." *Citizens Ins. Co. v. Secura Ins.*, 279 Mich. App. 69, 74 (2008). Absent a determination that there was no specific incident of misconduct involving C.W., the general allegation quoted above remains sufficient to bring C.W.'s claims within the meaning of "abuse or molestation."

another aide in the room intervened on [the plaintiff]'s behalf to prevent [Turbiak] and [Respondek] from inflicting further physical, emotional, and verbal abuse." (*Telerico* Complaint ¶ 19.)

As far as the *Gohl* lawsuit is concerned, the Sixth Circuit's opinion affirming the district court's dismissal of plaintiff's federal claims on summary judgment does not negate the applicability of Endorsement 11 for two reasons. First, the Sixth Circuit's findings as regards the federal claims do not exclude the allegations in the *Gohl* lawsuit as a matter of law from the category of "abuse or molestation" claims as that term was defined in the *Hall* cases. Indeed, in addition to the findings that Plaintiffs have cited, the Sixth Circuit also found that a reasonable jury could deem Turbiak to have used excessive force when she committed the alleged wrongful acts, and also characterized the allegations in the case as "abuse" allegations throughout the opinion. *See Gohl*, 836 F.3d at 679, 683-84. Second and more importantly, the Sixth Circuit's opinion did not address the merits of the plaintiff's state-law claims. In fact, in a recent opinion, the Michigan Court of Appeals characterized the allegations in the *Gohl* state-court complaint (filed after the district court dismissed the federal claims on summary judgment) as constituting allegations of abuse, and also rejected the defendants' argument that the Sixth Circuit's opinion regarding the federal claims should have preclusive effect on the state-law claims. *See Gohl v. Turbiak*, No. 335389, 2018 WL 2067796, at *7 (Mich. Ct. App. May 3, 2018)

(explaining that owing to the different standards applicable to the federal and state claims, "we do not consider the Sixth Circuit's conclusion regarding Turbiak's intent binding in state court," and concluding that "Turbiak has not established that she is entitled to governmental immunity" on the state-law assault and battery claim).

In summary, the Court finds that Endorsement 11 is not limited to "abuse or molestation" of a sexual nature, and that the underlying lawsuits allege conduct that constitutes "abuse or molestation" under the Michigan Court of Appeals' *Hall* decisions. In addition, as discussed *infra*, the Court has determined that Endorsement 11 is not limited to Selective's duty to indemnify, and is not made ambiguous either by the phrase "abuse of molestation" or by its amendment of a General Aggregate Limit that is otherwise "N/A." For these reasons, the Court finds that Endorsement 11 applies to Selective's coverage of the underlying lawsuits, and establishes a General Aggregate Limit of $1,000,000 on "abuse and molestation coverage."

### c) Endorsement 11 (Erosion by Defense Costs)

Separate from the issue of Endorsement 11's effect on the Primary Policies' General Aggregate Limit is the question of whether defense costs paid or reimbursed by Selective count towards (or "erode") the General Aggregate Limit. On this specific issue, and for the reasons set forth below, the Court finds that the relevant policy language favors Plaintiffs' position.

Plaintiffs' primary argument in this regard is that Endorsement 11 actually

concerns Selective's duty to indemnify (i.e., to pay or reimburse judgments or settlements) rather than its duty to defend (i.e., to pay or reimburse defense costs). This argument is based on the phrase "actual or threatened abuse [or] molestation" in Endorsement 11: specifically, Plaintiffs argue that the use of this language, rather than something like "*allegations of* abuse or molestation," suggests that abuse or molestation coverage only comes into play after allegations have been proven or admitted. (*See* Pl.'s Resp. at 10-12, Pg ID 3093-95.)

Considered in the context of the policy as a whole, this argument does not hold water. Endorsement 11 expressly refers to the General Liability provisions set forth earlier in the body of the policy, as it provides that "PART III, Section K: General Liability, the General Aggregate Limit of Liability applicable to Abuse or Molestation coverage only is amended to $1,000,000." (2011-2012 Policy at Pg ID 109.) General Liability under the policy, upon which Endorsement 11 imposes a ceiling of $1 million, extends to both "damages, direct and consequential" and "expenses." (*Id.* at Pg ID 109; *see also id.* ("Only damages and expenses defined by Ultimate Net Loss are covered.").) This section of the policy goes on to provide that "[t]hese payments cover . . . bodily injuries or personal injuries, suffered *or alleged to have been suffered.*" (*Id.* (emphasis added).) Thus, the broader coverage provisions that Endorsement 11 modifies themselves govern Selective's duty to defend as well as its duty to indemnify, which undercuts Plaintiffs' argument that

70

Endorsement 11 on its face only pertains to the latter.[17]

At the same time, Plaintiffs raise a stronger argument that defense costs do not erode the General Aggregate Limit based on the first of the 2011-2012 Primary Policy's "Common Policy Conditions," entitled "Policy Limit," which provides that "[t]he policy limit will not be reduced by defense cost or loss adjustment expenses." (2011-2012 Primary Policy at Pg ID 123.) In their Motion for Partial Summary Judgment, Plaintiffs explicitly cite this language in support of their position that under the 2011-2012 Primary Policy, "once the SIR is eroded, Selective's indemnity limits are not eroded by defense costs, and it owes defense cost[s] outside of the limits." (Pls.' Mot. at 2, Pg ID 2547.) Selective did not address this argument or the "Policy Limit" provision in its Response to Plaintiffs' Motion, or indeed in any of its filings on the instant Motions or at the December 14, 2017 hearing.

The term "policy limit" is not defined anywhere in the 2011-2012 Policy. If "policy limit" refers to the General Aggregate Limit, then Plaintiffs' position that

---

[17] Indeed, the logic underlying this argument applies just as forcefully to Endorsement 19—which Plaintiffs' coverage under the Primary Policies depends upon—as it does to Endorsement 11. Like Endorsement 11's abuse/molestation limitation, Endorsement 19's corporal punishment exception to the policy's general bodily injury exclusion also does not explicitly use the terms "allegation" or "alleged." (*See* 2011-2012 Primary Policy at Pg ID 160.) Plaintiffs presumably do not take the position that this limits Endorsement 19 to indemnity coverage, since their arguments on the instant Motions cite Endorsement 19 as a basis for coverage of defense costs, and they offer no explanation as to why the absence of words like "allegation" or "alleged" should affect the two Endorsements differently.

71

defense costs do not erode the General Aggregate Limit has merit, and this interpretation of "policy limit" is the most obvious interpretation. If nothing else, the absence of any definition of "policy limit" in the 2011-2012 Primary Policy creates an ambiguity as to the provision that "[t]he policy limit will not be reduced by defense cost or loss adjustment expenses." (2011-2012 Primary Policy at Pg ID 123.) Further, Plaintiffs have submitted evidence that at some time prior to July 2014, the parties understood this to be the case. The evidentiary record contains two separate documents called "Review and summary," which Behrens testified was the sort of document that she would "put together to just kind of go through and summarize the case." (Behrens Dep. 50:23-51:11.) At the top of the document, each "Review and summary" sets forth the Policy Number, identifies MAISL as the insured party, and states: "Limits: $1,000,000 with $500,000 SIR (Expenses erode SIR, but not the policy limit)." (Pls.' Mot. Exs. 34, 35.)

The Court thus finds that the 2011-2012 Primary Policy is ambiguous as to whether defense costs erode the General Aggregate Limit as modified by Endorsement 11. The Court further finds, in light of the evidence discussed above as well as the principle that "[i]f an ambiguity exists, it is resolved in favor of the insured," *Michigan Basic Prop. Ins. Ass'n v. Wasarovich*, 214 Mich. App. 319, 322 (1995), that under the 2011-2012 Primary Policy as modified by Endorsement 11, payment or reimbursement of defense costs are effective to erode the applicable

SIRs, but not the General Aggregate Limit.[18]

### d) SBLL Policy and Umbrella Policies

Selective also requests summary judgment on Plaintiffs' declaratory judgment claims regarding the SBLL Policy (Count II) and the Umbrella Policies (Count III). For the following reasons, the Court finds that both policies by their terms preclude coverage for the underlying lawsuits.

### i. *SBLL Policy*

Selective sent letters to MAISL denying coverage under the SBLL Policy between December 2012 and August 2013. (Compl. Exs. 15-17.) In those letters, Selective identified several applicable exclusions in the policy, and ultimately

---

[18] Selective, through counsel Collins Einhorn, apparently did address the Policy Limit provision under Common Policy Conditions in the June 12, 2015 letter to MAISL:

> We were recently advised of your position that based on a Common Policy Condition, policy limits would not be reduced by defense costs. We think that in this particular case, given that Section K provides that Selective will not pay more than the limit of liability, and since Selective will only be liable for Ultimate Net Loss, which includes defense costs, the total limit of liability must include defense costs.

(June 12, 2015 Letter at Pg ID 751.)

The Court does not find this reasoning persuasive. First, although it adequately accounts for the way in which the Section K provisions would interact in the absence of the Policy Limit condition, it effectively reads the Policy Limit condition out of existence, which is a convenient interpretation but not a reasonable one. Second, even if the interpretation in the June 12, 2015 letter is in fact cogent, it does not resolve the ambiguity created by the Policy Limits condition, and for the reasons summarized above, that ambiguity is resolved in favor of Plaintiffs' interpretation.

denied coverage for the *Gohl* lawsuit based on exclusions for bodily injury and for assault and battery (Compl. Ex. 15 at Pg ID 630); for the *Doe* lawsuit based on exclusions for bodily injury, assault and battery, and criminal or willful acts (Compl. Ex. 16 at Pg ID 644); and for the *Telerico* lawsuit based on exclusions for bodily injury, assault and battery, and emotional distress (Compl. Ex. 17 at Pg ID 644). Selective reasserts those positions here, and also maintains that the SBLL Policy's abuse or molestation exclusion applies. (*See* 2011-2012 Primary Policy at Pg ID 225.)

Plaintiffs make two arguments in response. First, they argue that there is a caveat at the end of the abuse or molestation exclusion that guarantees some coverage: "[n]otwithstanding the above, the most the Company shall pay to defend or investigate any actual or, threatened abuse or molestation claim shall be $100,000 annually per member district." (Compl. Ex. 3, SBLL Policy at Pg ID 225.) Second, they argue that the Limited Civil Legal Expense for Innocent Insureds Endorsement (*id.* at Pg ID 219) entitles them to coverage.

These arguments lack merit, however, because each argument only concerns one of several provisions of the SBLL Policy, each of which provides an independent basis for exclusion of the underlying lawsuits from coverage. It is unclear that the first provision cited by Plaintiffs, providing that Selective shall pay no more than $100,000 annually per member school district to defend or investigate abuse or

74

molestation claims, affirmatively creates an exception to the abuse or molestation exclusion at all; even if it does, that exception applies *only* to the abuse or molestation exclusion. In addition, the Limited Civil Legal Expense for Innocent Ensureds Endorsement by its terms applies only to "'civil legal expenses' payable or paid by an insured in connection with a 'suit' alleging a dishonest, fraudulent, criminal or malicious act or omission by the insured"—a suit, in other words, that would otherwise fall outside of the SBLL Policy by virtue of having arisen from "any dishonest, fraudulent, criminal or malicious act or omission by the insured." (*Id.* at Pg ID 229.)

Selective's denial of coverage under the SBLL Policy was not premised solely on the SBLL Policy's exclusion of claims arising from "abuse or molestation" or from "a dishonest, fraudulent, criminal or malicious act or omission by the insured." It was also separately premised on the SBLL Policy exclusions for claims arising from bodily injury, and for claims arising from assault and battery. (*See id.* at Pg ID 207.) As these exclusions are entirely independent from the two exclusions affected by the provisions Plaintiffs cite in their argument concerning the SBLL Policy, that argument must fail. *See Matouk*, 320 Mich. App. at 410 ("While exclusionary clauses in insurance policies are strictly construed in favor of the insured, coverage under a policy is lost if *any exclusion in the policy* applies to an insured's particular claims.") (emphasis added) (internal quotation marks and citations omitted) (quoting

*Century Surety Co. v. Charron*, 230 Mich. App. 79, 83 (1998)).

### ii. *Umbrella Policies*

Selective's position as regards the 2011-2012 Umbrella Policy[19] is that coverage for the underlying lawsuits is precluded by several different terms of that policy: (1) the "abuse or molestation" exclusion, which contains language materially identical to the "abuse or molestation" limitation in the 2011-2012 Primary Policy (*see* 2011-2012 Umbrella Policy at Pg ID 253); (2) the "expected or intended injury" exclusion, which eliminates coverage for "[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured," and, unlike the similar provision in the 2011-2012 Primary Policy, does not contain a "corporal punishment" exception (*see id.* at Pg ID 238); and the "sub-limit exclusion," which has to do with the underlying insurance policies that the 2011-2012 Umbrella Policy supplements, and provides that "[i]f the applicable limit of insurance of an 'underlying policy' is a 'sub-limit', this insurance will not apply, whether or not such 'sub-limit' has been reduced by any payments under the 'underlying policy'" (*see id.* at 245). "Sub-limit" is defined as "a limit of insurance of the 'underlying policy' which . . . [a]s originally granted at the effective date of the 'underlying policy', or .

---

[19] As with the Court's analysis of the Primary Policies, *supra*, the analysis here cites and focuses on the 2011-2012 Umbrella Policy, but applies equally to the other Umbrella Policies, except where indicated.

. . [a]t its original addition by endorsement to that 'underlying policy'[,] is an amount less than that stated in the Declarations of this policy." (*Id.* at Pg ID 251.)

Most of Plaintiffs' arguments on the instant Motions that concern the 2011-2012 Umbrella Policy are estoppel arguments, and are therefore considered in the context of Plaintiffs' estoppel claims below. Additionally, to the extent that Plaintiffs raise the same arguments as to the "abuse or molestation" exclusion in the 2011-2012 Umbrella Policy as they raised with regard to the similar "abuse or molestation" limitation in the Primary Policies, those arguments are discussed *supra*.

For the purposes of Plaintiffs' declaratory judgment claims, the Court finds that the 2011-2012 Umbrella Policy provisions cited by Selective (and quoted in the previous paragraph of this Opinion and Order), by their terms, preclude coverage under the 2011-2012 Umbrella Policy for the underlying lawsuits.

### 2. Reformation Claim (Count VI)

Selective also requests summary judgment on Plaintiffs' reformation claim (Count VI). "Absent a mutual mistake or a unilateral mistake coupled with fraud, shown by clear and convincing evidence, [Michigan courts have] declined to reform written instruments." *Windham v. Morris*, 370 Mich. 188, 192 (1963). Plaintiffs have provided no evidence of a mutual mistake, or a unilateral mistake coupled with fraud, specifically regarding the provisions on which Selective bases its coverage positions.

Moreover, although Selective specifically identify Plaintiffs' reformation

claim in its Motion for Summary Judgment, and argue that Plaintiffs have not offered evidence on which a reasonable jury could find for them on that claim, Plaintiffs do not address Selective's argument in their Response, or indeed make reference to the reformation claim at all. The Court will therefore regard the reformation claim as abandoned. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (collecting authorities).

For these reasons, Selective is entitled to summary judgment on Plaintiffs' reformation claim.

### 3. Estoppel Claims (Counts VII and VIII)

Plaintiffs' estoppel claims are pled in the alternative to Plaintiffs' declaratory judgment claims. The implication of this is that while the declaratory judgment claims seek a declaration that Selective's current coverage positions are unsupported by the language in the policies themselves, the estoppel claims seek to hold Selective to what Plaintiffs characterize as Selective's earlier coverage positions. For the reasons set forth below, the Court finds that Plaintiffs have failed to raise a genuine issue of material fact as to all theories of estoppel except for one: the theory that Selective's failure to reserve its rights under the Umbrella Policies now estops it from fully disclaiming coverage under that policy.

An insurer's "duty to defend is broader than the duty to indemnify. If the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense. This is true even where the claim may be groundless or frivolous." *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51 (1996) (citations omitted). As the Michigan Supreme Court has explained:

> An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

*Id.* (quoting *Protective Nat'l Ins. Co. v. City of Woodhaven*, 438 Mich. 154, 159 (1991)).

In limited circumstances, Michigan courts estop insurers from asserting defenses to coverage that the insurers did not assert at an earlier time. For example, "once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses." *Kirschner v. Process Design Assocs., Inc.*, 459 Mich. 587, 593 (1999) (collecting cases). "Further, when an insurance company undertakes the defense of its insured, it has a duty to give reasonable notice to the insured that it is proceeding

under a reservation of rights, or the insurance company will be estopped from denying its liability." *Id.* (citing *Meirthew v. Last*, 376 Mich. 33, 39 (1965)). But "[t]he application of waiver and estoppel is limited, and, usually, the doctrines will not be applied to broaden the coverage of a policy to protect the insured against risks that were not included in the policy or that were expressly excluded from the policy." *Id.* at 594 (citing *Ruddock v. Detroit Life Ins. Co.,* 209 Mich. 638, 654 (1920) and *Lee v. Evergreen Regency Cooperative,* 151 Mich. App. 281, 285 (1986)). This, the Michigan Supreme Court explained in *Kirschner*, "is because an insurance company should not be required to pay for a loss for which it has charged no premium." *Id.* Even so, the *Kirschner* court qualified this principle:

> Despite the limited applications of waiver and estoppel, in some instances, courts have applied the doctrines to bring within coverage risks not covered by the policy. For example, in situations in which the insurance company has misrepresented the terms of the policy to the insured or defended the insured without reserving the right to deny coverage, courts have extended coverage beyond the terms of the policy when the inequity to the insurer as a result of the broadened coverage is outweighed by the inequity suffered by the insured.

*Kirschner*, 459 Mich. at 594–95 (citing *Smit v. State Farm Mut. Automobile Ins. Co.,* 207 Mich. App. 674 (1994) and *Lee v. Evergreen Regency Cooperative,* 151 Mich. App. 281 (1986)).

Where equitable estoppel is available, the insured can only successfully invoke it by demonstrating that

(1) the [insurer]'s acts or representations induced the [insured] to believe that the [policy clause at issue] would not be enforced and that coverage would be provided, (2) the [insured] justifiably relied on this belief, and (3) the [insured] was prejudiced as a result of its reliance on its belief that the clause would not be enforced and coverage would be provided.[20]

*City of Grosse Pointe Park*, 473 Mich. 188, 204 (2005) (citing *Morales v. Auto-Owners Ins. Co.*, 458 Mich. 288, 296-97 (1998)).

Before addressing the estoppel question, Plaintiffs argue at the threshold that Selective has a duty to defend the underlying lawsuits under the 2011-2012 Primary Policy, because the allegations in those lawsuits trigger the 2011-2012 Primary Policy's General Liability coverage, and because to any extent those allegations fall within the "Expected or Intended Injury" exclusion, they also fall within the "Corporal Punishment" exception to that exclusion set forth in Endorsement 19 to the policy. (*See* Compl. Ex. 2, 2011-2012 Primary Policy at Pg ID 160.) In support of their contention that the allegations in the underlying lawsuits allege conduct that constitutes "corporal punishment," Plaintiffs cite the Sixth Circuit's decision in

---

[20] *City of Grosse Pointe Park* was a split decision by the Michigan Supreme Court, and although all six of the justices on the panel concurred in the outcome, the court was split specifically over whether the three-part *Morales* test quoted above was appropriate. The three justices that rejected the use of that test, however, believed that the equitable estoppel doctrine could not apply to begin with because the effect would be to create coverage for a risk that was "expressly excluded from the policy" at issue. *City of Grosse Pointe Park*, 473 Mich. at 222-24 (Young, J., concurring). That is not the case here, and so *City of Grosse Pointe Park*'s use of this standard is, at the very least, strongly persuasive authority for this Court.

*Gohl*, in which the Sixth Circuit affirmed the district court's dismissal of the federal claims in the action on summary judgment, in part because it found that Turbiak (the teacher alleged to have abused the plaintiff) had a "pedagogical justification" for her actions. *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 679 (6th Cir. 2016). Plaintiffs also cite the Michigan statutory definition of "corporal punishment" set forth in Mich. Comp. Laws § 380.1312(1): "'corporal punishment' means the deliberate infliction of physical pain by hitting, paddling, spanking, slapping, or any other physical force used as a means of discipline."

There is no clear basis for disputing that the underlying lawsuits at least arguably allege acts that could be considered corporal punishment, and Selective essentially concedes this point when it states that "there is an argument that the acts [alleged in the underlying lawsuits] were corporal punishment." (Def.'s Resp. at 10, Pg ID 2922.) For these reasons, it is apparent that the underlying lawsuits sufficiently allege "corporal punishment" as to implicate Endorsement 19 to the Primary Policies. (*See* 2010-2011 Primary Policy at Pg ID 1086; 2011-2012 Primary Policy at Pg ID 160.) Thus, the real issue here is not whether Selective has or had *any* duty to defend the underlying lawsuits under the 2011-2012 Primary Policy—it is whether Selective must be estopped from asserting the coverage positions that it currently asserts (and first asserted in 2015) based on its earlier actions.

A preliminary issue with Plaintiffs' estoppel claims—or at least those

82

involving the 2011-2012 Primary Policy—is that Selective did in fact reserve its

rights under the policy in its initial RORs for each of the underlying lawsuits, even

if those reservations were made in general terms. Each of the four RORs issued in

the first half of 2013 contained, both at the beginning and the end of the body of the

letter, reservation-of-rights language that extended to the entire policy. The January

17, 2013 ROR regarding the *Gohl* lawsuit, for example, stated in its second

paragraph that Selective was "***issuing this letter under full Reservation of Rights to***

***Livonia Public Schools and all defendants* . . . .**" (Compl. Ex. 18 at Pg ID 647.)

And the final paragraph of the letter clarified that

> Selective reserves all rights under policy 81323571 with effective dates
> of 7-1-2011 to 7-1-2012 including any rights, definitions, conditions,
> provisions or exclusions that may apply. We reserve the right to
> supplement this letter at any time. *By inclusion of certain policy
> language within this letter we are not waiving any of our rights to any
> other policy language that may apply.* If an amended lawsuit is
> received, please provide a copy for review of our coverage position.

(*Id.* at Pg ID 664 (emphasis added).)

Thus, this case cannot be said to fall within the two clear examples stated in

*Kirschner*: that is, cases in which the insurer "has denied coverage to an insured and

stated its defenses [and therefore] has waived or is estopped from raising new

defenses," and cases in which an insurer breaches its "duty to give reasonable notice

to the insured that it is proceeding under a reservation of rights . . . ." *Kirschner*, 459

Mich. at 593.

*Kirschner* does not purport to lay out an exhaustive list of estoppel scenarios, however, and so Plaintiffs may still make out claims for estoppel if they can demonstrate the necessary elements: acts by the insurer that induced a belief that the particular policy provision would not be enforced, justifiable reliance on that belief, and prejudice resulting from it. *See City of Grosse Pointe Park*, 473 Mich. at 204 (citing *Morales*, 458 Mich. at 296-97). Given Selective's general reservation of rights, though, Plaintiffs' argument must be that the RORs' failure to mention the *specific* limitations on or defenses to coverage that were later raised caused such a belief. Anticipating such an argument, Selective has cited several decisions by the United States District Court for the Western District of Michigan (applying Michigan law) that stand for the proposition that a general reservation of rights, followed by the assertion of defenses to coverage that was not specifically mentioned in the reservation of rights, does not alone justify estopping the insurer from asserting those defenses. *See, e.g., Lansing Bd. of Water & Light v. Deerfield Ins. Co.*, 183 F. Supp. 2d 979, 984 (W.D. Mich. 2002) ("[U]nder Michigan law, an insurance company that undertakes a defense of its insured with a general reservation of rights does not waive any potential defenses to coverage, if the insured was not prejudiced in asserting its position of coverage."); *Action Auto Stores, Inc. v. United Capitol Ins. Co.*, 845 F. Supp. 417, 424 (W.D. Mich. 1993) (estoppel unwarranted where insurer had generally reserved rights before asserting specific exclusion).

84

Plaintiffs have not cited authority to the contrary. They cite one case to support their assertion that "'[a]n insurer must promptly explain the specific policy provisions upon which it bases its coverage defense(s), and does not provide adequate notice by merely telling its policyholder that it reserves 'any defenses' or 'waives none of its rights.'" (Pls.' Mot. at Pg ID 2566 (citing *Meirthew v. Last*, 376 Mich. 33, 38-39 (1965)). But *Meirthew* does not stand for this proposition. *Meirthew* concerned a general reservation of rights, but the Michigan Supreme Court in that case relied upon the following rule in holding that an insurer's total denial of an obligation to indemnify the insured party's damages could be estopped despite a previous general reservation of rights:

> [W]hen an insurer, although obligated to defend under the terms of its policy, with knowledge [*sic*] of or means of ascertaining facts which, if established, will relieve it from liability at the suit of the insured, undertakes and prosecutes the defense, without giving reasonable notice to the insured that it does not consider itself liable to it under the policy, it is estopped to deny its liability.

*Meirthew v. Last*, 376 Mich. 33, 39 (1965) (quoting *Fidelity & Casualty Co. of N.Y. v. Board of County Road Com'rs of Schoolcraft County*, 267 Mich. 193, 198 (1934)).

Putting aside that *Meirhew* had to do with liability rather than the duty to defend, the case also turned on the question of "reasonable notice" and involved a substantial amount of prejudice to the insured. Insofar as Plaintiffs' argument is that a general reservation of rights that does not specifically mention an insurer's defense

to coverage is wholly insufficient to preserve that defense, *Meirhew* does not support such an argument.

Plaintiffs' estoppel claims are also deficient for a more fundamental reason, however: for each coverage position that Plaintiffs argue Selective should be estopped from asserting (with one significant exception, discussed *infra*), Plaintiffs have failed to raise a genuine issue of material fact as to one or more of the essential elements of an equitable estoppel claim: (1) acts by the insurer inducing a belief that coverage would be provided, (2) justifiable reliance on that belief, and (3) prejudice resulting from that reliance. *See City of Grosse Pointe Park*, 473 Mich. at 204 (citing *Morales*, 458 Mich. at 296-97).

Plaintiffs challenge Selective's coverage positions in four respects: (1) Selective's position that the underlying lawsuits contain eight occurrences over the 2010-2011 and 2011-2012 policy periods, thus creating eight separate $500,000 SIRs that must be exhausted; (2) Selective's position that there is a $1,000,000 general aggregate limit on its liability under each of the 2010-2011 and 2011-2012 Primary Policies; (3) Selective's position that its payment of defense costs (as opposed to damages) count towards the $1,000,000 general aggregate limit of each policy; and (4) Selective's position that the 2011-2012 Umbrella Policy does not apply at all. For the reasons set forth below, the first three of these four challenges falls short of establishing the basis for an equitable estoppel claim. At the same time,

Plaintiffs have raised a genuine issue of material fact as to the basis for an estoppel claim regarding the Umbrella Policies, and so Selective's Motion for Summary Judgment will be denied as to that theory of Plaintiffs' estoppel claims.

### a) Number of Occurrences in the Underlying Lawsuits

As stated in the 2015 letters, Selective's position regarding the number of occurrences in the underlying lawsuits—which in turn sets the number of $500,000 SIRs that Plaintiffs must exhaust before being entitled to defense cost reimbursement or indemnification—was that there were a total of nine across policy years 2010-2011 and 2011-2012: one in 2011-2012 from the *Gohl* lawsuit, three in each year from the *Doe* lawsuit, and one in each year from the *Telerico* lawsuit. Selective now represents that it has learned that the *Telerico* plaintiff did not attend the school where the alleged incidents took place during the 2010-2011, and therefore agrees that "only the 2011-2012 Primary Policy is potentially applicable." (ECF No. 59, Def.'s Mot. at Pg ID 2797; ECF No. 65, Def.'s Resp. at Pg ID 2918.) So Selective's current position is that there are eight occurrences and thus eight SIRs, and, as discussed *supra*, the Court finds that this interpretation is justified by the policy.

Plaintiffs claim that Selective should be estopped from asserting more than two occurrences: one for the *Doe* lawsuit in policy year 2010-2011, and one for both the *Gohl* and *Telerico* lawsuits in 2011-2012. Plaintiffs argue that this what Selective had determined was the case prior to 2015; that in the April 20, 2015 letters Selective

took the position that there were five occurrences, because the *Doe* lawsuit included three occurrences rather than one; and that in the July 17, 2015 letter, Selective had increased the number to nine, because the allegations in the *Doe* and *Telerico* lawsuits spanned both policy periods.

Plaintiffs' stated basis for its estoppel claim regarding this issue is that Selective determined internally that there were only two occurrences in the underlying lawsuit. Accordingly, Plaintiffs argue, "Behrens and her manager decided to set up two claims with one $500,000 SIR in the 2011-2012 policy period for the Gohl and Telerico lawsuits, and one $500,000 SIR in the 2010-2011 policy period for the Doe lawsuit." (Pls.' Mot. at Pg ID 2554.)

In support of an estoppel claim based on this, Plaintiffs cite a nondescript listing of exhibits to the Amended Complaint and to their Joint Motion. To whatever extent these exhibits illuminate Selective's subjective and internal understanding of the number of occurrences, they do not include evidence that would justify a finding of reliance. Behrens testified that there was some initial internal confusion as to the number of occurrences (Behrens Dep. 163:18-165:22), but this testimony does not establish that Selective at any time represented to Plaintiffs that that number was necessarily limited to two. The same is true of an internal email among Selective employees discussing the two claims (Pls.' Mot. Ex. 55), as well as an email that Behrens sent to defense counsel in the underlying lawsuits directing them to bill to

the two claims that Selective initially set up (Pls.' Mot. Ex. 57).

None of these exhibits speak to an act or omission by Selective that would justify reasonable reliance on Plaintiffs' part that the underlying lawsuits would be regarded as containing only two occurrences, and there is no language in the Primary Policies that supports the conclusion that the underlying lawsuits would be combined into one occurrence for a given policy year any more than it supports the opposite conclusion. In fact, one communication from June 2013 weighs against a finding that Plaintiffs had any basis for a reasonable belief that the underlying lawsuits would ultimately contain only two occurrences: the email that Behrens sent to MAISL's third-party administrator Gallagher Basset on the day she sent MAISL the two RORs, in which she stated that the *Gohl* and *Telerico* claims "have the allegations within the 7-1-11 to 12 term, *with singular events on each child.*" (Compl. Ex. 23 at Pg ID 685 (emphasis added).)

The RORs that Selective sent to MAISL in early 2013 specifically identified the 2011-2012 Primary Policy as applicable to the *Gohl* and *Telerico* lawsuits and both the 2010-2011 and 2011-2012 Primary Policies as applicable to the *Doe* lawsuit, and Selective broadly reserved its rights under those policies in those RORs. Plaintiffs have not shown any conduct on Selective's part that would justify a belief that the occurrences in the underlying lawsuits would be limited to two, nor any evidence that such a belief could be justifiably relied upon.

Accordingly, the Court will grant Selective's Motion for Summary Judgment to the extent it seeks summary judgment on Plaintiffs' claim that Selective should be estopped from asserting any coverage position other than one in which there are two occurrences and thus two SIRs.

### b) Endorsement 11 (Effect on General Aggregate Limit)

Plaintiffs argue that Selective should be estopped from asserting its coverage position that each Primary Policy that is triggered by the underlying lawsuits—specifically, the 2010-2011 and 2011-2012 Primary Policies—has a general aggregate limit of $1,000,000. Selective's position on this issue is again based on Endorsement 11 to the Primary Policies, which provides that "the General Aggregate Limit of Liability applicable to Abuse or Molestation coverage only is amended to $1,000,000." (2011-2012 Primary Policy at Pg ID 151.) The evidence in the record shows that Selective did not assert that Endorsement 11 applied to coverage for the underlying lawsuits until the letters it sent to MAISL in 2015.

The crux of Plaintiffs' estoppel argument as to Endorsement 11 is that Lene Behrens, the first Selective claims adjuster assigned to their policies, viewed Endorsement 11 as applicable only to sexual abuse or molestation and this accounted for Selective's failure to raise the issue in its initial RORs. Plaintiffs have submitted credible evidence that Behrens viewed the term "abuse and molestation," which is not otherwise defined in the policy, in this way. For example, in an email to other

Selective personnel regarding coverage for the underlying lawsuits under the SBLL Policy—which has its own exclusion for claims arising from alleged abuse and molestation—Behrens wrote that the claims in the underlying lawsuits "are not sexual in any nature- and there is no definition of Abuse and Molestation anywhere for the SBLL. The alleged abuse is that of excessive discipline/dealing with the special needs children in a less than professional or accepted manner." (Pls.' Mot. Ex. 45 at Pg ID 2608.) Behrens also testified on several different occasions in her deposition that Endorsement 11 was intended to be (and that she understood it to be) limited to abuse or molestation with a sexual dimension. (Pls.' Mot. Ex. 122, Deposition of Lene Behrens at 78:20-22; 115:12-116:11; 132:25-133:6.) Behrens also testified that her manager Bill VanVeldhuisen agreed with her view (Behrens Dep. 147:7-10), and that the first four RORs she sent out during the first half of 2013 did not mention Endorsement 11 because she did not believe it applied to non-sexual abuse or molestation (Behrens Dep. 139:16-25). Asked in her deposition how she gained that understanding, Behrens testified: "I think just through file handling and through our conversations with [VanVeldhuisen] and through the years. It just was an understanding that that was a sexual form." (Behrens Dep. 71:16-23.)

Probative though this evidence is of an inference that Behrens understood Endorsement 11 (as well as the other "abuse or molestation" provisions in the policies) to be limited to sexual abuse or molestation, the problem with Plaintiffs'

91

argument is that they have not pointed to any communications or representations *made to them* demonstrating that any Selective personnel had this interpretation. Equitable estoppel in this context requires some act or omission on the part of the insurer that engenders a belief that a particular provision or exclusion will or will not apply, which the insured must then reasonably rely on and thereby suffer prejudice. At most, Plaintiffs' evidence demonstrates an understanding on Selective's part that Endorsement 11 was limited to sexual abuse or molestation, but there is no evidence that Selective communicated this to Plaintiffs. Indeed, Plaintiffs' counsel acknowledged at oral argument that Selective did not communicate this interpretation of Endorsement 11 to Plaintiffs prior to 2015. (ECF No. 74, Transcript of December 14, 2017 Hearing at 34:24-35:8.)

As discussed above, the mere failure on Selective's part to mention Endorsement 11 in the initial RORs is not enough by itself to engender prejudicial reliance on Plaintiffs' part—particularly in the absence of ambiguity regarding the scope of the provision. On its face, Endorsement 11 contains no indication that it is limited to sexual abuse or molestation claims, and testimony by an insurer's employees is insufficient by itself to establish the existence of a textual ambiguity. *See Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 429 (6th Cir. 2016) (finding that the "inherent subjectivity" of the testimony of an insurer's former claims adjusters and underwriters made it "insufficient for the

purpose of detecting a latent ambiguity" and concluding that "the plain language of the written instrument" was controlling) (collecting cases).

Plaintiffs have not presented evidence that creates a genuine issue of material fact as to their reasonable reliance on any representation by Selective that Endorsement 11 was limited to sexual abuse or molestation, or would be inapplicable for any other reason. Accordingly, Selective is entitled to summary judgment on Plaintiffs' estoppel claims insofar as they seek to estop Selective from relying on Endorsement 11 for its coverage positions.

### c) Endorsement 11 (Erosion by Defense Costs)

Plaintiffs advance a similar argument that Selective should be estopped from claiming that the $1,000,000 General Aggregate Limit imposed by Endorsement 11 is eroded by defense costs in addition to indemnity costs. And as with their estoppel argument regarding the general applicability of Endorsement 11, Plaintiffs have not established a basis on which a reasonable jury could find reasonable, detrimental reliance on their part. Instead, Plaintiffs only submit evidence that Behrens and/or other Selective employees subjectively understood that defense expenses would not apply towards any ultimate limitations on Selective's liability under the policies: deposition testimony by Behrens that she had this understanding, and the internal "Review and summary" documents, discussed earlier, which characterize the Primary Policies with the phrase "Expenses erode SIR, but not the policy limit."

(Behrens Dep. 48:24-49:23; Pls.' Mot. Exs. 34, 35.) Here again, estoppel requires reliance, and Plaintiffs have not pointed to any communication that would justify it.

However, as discussed *supra*, this Court has found that the terms of the Primary Policies do not support Selective's argument that defense costs erode the General Aggregate Limit, and that to whatever extent they do not support Plaintiffs' position outright, they create an ambiguity that must be resolved in Plaintiffs' favor. Thus, although Selective is entitled to summary judgment on Plaintiffs' estoppel claims when it comes to the erosion of the General Aggregate Limit by defense costs, Plaintiffs are entitled to summary judgment on their declaratory judgment claims on that specific issue.

### d) Umbrella Policies

Finally, Selective seeks summary judgment on Plaintiff's estoppel claims as regards the Umbrella Policies. Fact issues preclude summary judgment for either party on this issue, and so the Court will deny Selective's Motion as to the estoppel claims concerning the Umbrella Policies.

The 2011-2012 Umbrella Policy contains provisions which on their face appear to preclude coverage for the underlying lawsuits under that policy, and as discussed above, this Court has found that Selective's interpretation of the 2011-2012 Umbrella Policy for the purposes of the declaratory judgment claims prevails.

On the estoppel issue, however, the Umbrella Policies are unique in one

important respect: they were not mentioned by name or by policy number anywhere in the initial round of RORs that Selective sent to MAISL in the first half of 2013. The fact that Selective reserved its rights—albeit in a general fashion—as to the Primary Policies is a significant factor in the estoppel inquiry here, and this Court's conclusion that Plaintiffs have not shown the reasonable reliance necessary for a finding of estoppel is based in part on those reservations of rights. Yet there was no such reservation of rights for the Umbrella Policies.

Plaintiffs cite Behrens's deposition testimony that she understood that the 2011-2012 Umbrella Policy did in fact apply (Behrens Dep. 145:22-146:25), but this does not show any communication between Selective and Plaintiffs about that policy. Still, the fact that Selective did not reserve its rights under the Umbrella Policy—and, for that matter, *did* reserve its rights under other policies in effect— raises a genuine issue of material fact as to whether Selective "defended the insured without reserving the right to deny coverage, *Kirschner*, 459 Mich. at 594, which the Michigan Supreme Court has recognized as a valid basis for equitable estoppel.

In their briefs on the instant Motions, the parties have not addressed the legal effect, if any, of Selective's omitting to make any reservations of rights under the 2011-2012 Umbrella Policy before April 20, 2015. Given that, and given the fact issues identified above, Selective's Motion for Summary Judgment will be denied as to the Umbrella Policies.

**B.    LPS/MAISL's Motion for Partial Summary Judgment as to Selective's Duty to Defend (ECF No. 57)**

The specific relief that Plaintiffs request in their Joint Motion for Partial Summary Judgment can be broken down into four components. Plaintiffs request that this Court declare:

(1) "that Defendant, Selective Insurance Company of the Southeast, has a duty to defend and reimburse LPS and MAISL under the General Liability coverage for the attorney's fees, costs and expenses incurred in the defense of the underlying lawsuits,"

(2) "that such defense costs be paid by Selective in addition to the policy's limits of liability,"

(3) "that the Umbrella policy applies," and

(4) "that Selective has waived and is estopped to change its original 2013 coverage position that that the three underlying lawsuits constitute two claims with two SIRs."

(Pls.' Mot. at Pg ID 2537.)

After addressing a procedural argument that Selective makes against Plaintiffs' Joint Motion as a whole, the remainder of this Opinion and Order will consider these issues in turn.

**1.    Plaintiffs' Noncompliance with Local Rule 7.1(a)**

As a threshold procedural matter, Selective contends that the Court should deny Plaintiffs' Joint Motion in its entirety because Plaintiffs failed to seek Selective's concurrence before filing it, in violation of Local Rule 7.1. This rule requires litigants in this District to attempt to ascertain whether a contemplated

96

motion will be opposed by the opposing party, and then to state the outcome of that attempt in the motion itself. *See* E.D. Mich. L.R. 7.1(a)(1)-(2).

Selective argues that Plaintiffs' Amended Joint Motion misleadingly suggests that Plaintiffs sought Selective's concurrence before filing their first Joint Motion, when in fact they did not do so until Selective sought Plaintiffs' concurrence in its own summary judgment motion. Plaintiffs respond that this Court's Civil Case Management and Scheduling Order imposes such a requirement on discovery motions but not on summary judgment motions,[21] that if Selective had in fact concurred in their Joint Motion then it would not have filed the brief in opposition that it did, and that any initial failure to seek concurrence should be excused because Plaintiffs belatedly sought Selective's concurrence and then filed the Joint Amended Motion representing as much.

Plaintiff does not dispute that it failed to seek initial concurrence from Selective, and its justifications for this failure are not persuasive. At the same time,

---

[21] What Plaintiffs refer to here is paragraph I.F of the Case Management Guidelines, which states that "[t]he Court strictly enforces the requirements of the Eastern District of Michigan Local Rules regarding format, timing and particularly seeking concurrence, E.D Mich. L.R. 5.1 and 7.1, as to all discovery motions." (ECF No. 19 at Pg ID 1734.) But paragraph I.A on the previous page of the Case Management Guidelines states that "[t]he Court requires strict compliance with E.D. Mich. L.R. 7.1(a) regarding concurrence, and the Court will strike pleadings and impose costs for failure to comply with the Local Rule" (ECF No. 19 at Pg ID 1733), and in any case, Local Rule 7.1(a) is not limited to discovery motions.

however, as a general rule, "the Federal Rules encourage courts to decide each claim on its merits rather than on procedural technicalities." *Decorative Panels Int'l, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers Local Lodge W-260*, 996 F. Supp. 2d 559, 568 (E.D. Mich. 2014) (citing *Foman v. Davis*, 371 U.S. 178, 181 (1962). Selective has cited no case law supporting the proposition that a dispositive motion should be denied for this reason, and the cases that Selective does cite fall far short of this. *See Brown v. United States*, 187 F. Supp. 2d 887, 891–92 (E.D. Mich. 2002) (holding that Local Rule 7.1(a) required a *pro se habeas* petitioner to seek the respondent's concurrence in his motion for a certificate of appealability just like any other litigant, but excusing the defect because the respondent's response to his previous substantive motion made it evident that the respondent would likely not have concurred); *Steele v. Punch Bowl Detroit, LLC*, No. 16-13816, 2017 WL 2821970, at *2 (E.D. Mich. June 29, 2017) (denying a motion to compel discovery responses for failure to comply with Local Rule 7.1(a)); *Tubbs Bros. v. Prime Eagle, LLC*, No. 12-13104, 2012 WL 3065451, at *1 (E.D. Mich. July 27, 2012) (denying without prejudice a motion for change of venue for the same reason).

The Court will not deny Plaintiffs' Joint Motion because of their noncompliance with Local Rule 7.1(a). At the same time, the Court notes that Plaintiffs have thoroughly failed to justify that noncompliance, and Plaintiffs' counsel is advised that further failure to abide by the Local Rules may result in

sanctions.

## 2. Duty to Defend

In their Joint Motion, Plaintiffs request a declaration by this Court "that Defendant, Selective Insurance Company of the Southeast, has a duty to defend and reimburse LPS and MAISL under the General Liability coverage for the attorney's fees, costs and expenses incurred in the defense of the underlying lawsuits." (Pls.' Mot. at Pg ID 2537.)

The arguments that Plaintiffs make in support of this request are analyzed in the discussion of Selective's Motion as regards Plaintiffs' declaratory judgment claims *supra* at Section III.A.1 of this Opinion and Order. For the reasons set forth in that Section, the Court finds that Selective's duty to defend encompasses three occurrences under the 2010-2011 Primary Policy for the *Doe* lawsuit, three occurrences under the 2011-2012 Primary Policy for the *Doe* lawsuit, one occurrence under the 2011-2012 Primary Policy for the *Gohl* lawsuit, and one occurrence under the 2011-2012 Primary Policy for the *Telerico* lawsuit. That duty to defend is subject to Endorsement 11 in both the 2010-2011 Primary Policy and the 2011-2012 Primary Policy.

## 3. Defense Costs

The arguments raised by Plaintiffs in their Joint Motion concerning the interplay of the General Aggregate Limit of the Primary Policies and the payment of

99

defense costs are evaluated *supra* at Section III.A.1.c of this Opinion and Order. For the reasons stated in that Section, the Court finds that by the terms of the 2010-2011 and 2011-2012 Primary Policies, the payment or reimbursement of defense costs does not erode the $1,000,000 General Aggregate Limit as modified by Endorsement 11 to those two policies. In this limited respect, Plaintiffs' Joint Motion for Partial Summary Judgment will be granted.

### 4. Umbrella Policy

Plaintiffs' arguments concerning the declaratory judgment claims regarding the Umbrella Policies are addressed *supra* at Section III.A.1.d.ii of this Opinion and Order. For the reasons stated in that Section, the Court finds that by their terms, the Umbrella Policies are not triggered by the underlying lawsuits.

### 5. Estoppel

Finally, Plaintiffs' estoppel arguments are discussed *supra* at Section III.A.3 of this Opinion and Order. As discussed in that Section, Plaintiffs have not evidenced a genuine issue of material fact as to their estoppel claims with one exception: their estoppel claim concerning the Umbrella Policies. As fact issues preclude summary judgment on this particular aspect of Plaintiffs' estoppel claims, both Selective's Motion for Summary Judgment and Plaintiffs' Joint Motion for Partial Summary Judgment will be denied. For all other aspects of the estoppel claims, Selective's Motion will be granted and Plaintiffs' Motion will be denied.

## IV.    CONCLUSION

For all of the reasons stated above, the Court hereby ORDERS as follows:

- Selective's Motion for Summary Judgment (ECF No. 59) is hereby
  - **GRANTED** as to Plaintiffs' declaratory judgment claims (Counts I-III), insofar as Selective seeks the following declarations by this court:
    - Selective's duty to defend the underlying lawsuits under the 2010-2011 and 2011-2012 Primary Policies is based upon three occurrences in the *Doe* lawsuit under the 2010-2011 Primary Policy, three occurrences in the *Doe* lawsuit under the 2011-2012 Primary Policy, one occurrence in the *Gohl* lawsuit under the 2011-2012 Primary Policy, and one occurrence in the *Telerico* lawsuit under the 2011-2012 Primary Policy;
    - Endorsement 11 to the 2010-2011 and 2011-2012 Primary Policy sets the General Aggregate Limit of Selective's liability to Plaintiffs for the underlying lawsuits at $1,000,000 for each of those two policies;
    - By its terms, the SBLL Policy does not impose upon Selective a duty to defend the underlying lawsuits; and
    - By their terms, the Umbrella Policies do not impose upon Selective a duty to defend the underlying lawsuits.
  - **GRANTED** as to Plaintiffs' Reformation claim (Count VI).
  - **GRANTED** as to Plaintiffs' estoppel claims (Counts VII-VIII), except to the extent that they concern the Umbrella Policies.
  - **DENIED** in all other respects
- Plaintiffs' Joint Motion for Partial Summary Judgment (ECF No. 57) is hereby
  - **GRANTED** as to Plaintiffs' declaratory judgment claims (Counts I-III), insofar as Plaintiffs seek the following declarations by this court:

- Selective's payment or reimbursement of defense costs pursuant to the 2010-2011 and 2011-2012 Primary Policies does not erode the General Aggregate Limit of those policies as modified by Endorsement 11 to those policies.
  - o **DENIED** in all other respects.
- Genuine issues of material fact preclude summary judgment on Plaintiffs' estoppel claims concerning the Umbrella Policies.

IT IS SO ORDERED.

Dated: AUGUST 24, 2018

Paul D. Borman
United States District Judge